1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| 10 LACEY MARKETPLACE ASSOCIATES II, LLC, | CASE NO. C13-0383JLR |
| 11 Plaintiff, | ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| 12 | |
| 13 v. | |
| 14 UNITED FARMERS OF ALBERTA COOPERATIVE LTD, et al., | |
| 15 Defendants. | |
| 16 BURLINGTON RETAIL, LLC, | CASE NO. C13-0384JLR |
| 17 Plaintiff, | |
| 18 v. | |
| 19 UNITED FARMERS OF ALBERTA COOPERATIVE LTD, et al., | |
| 20 Defendants. | |

21

22

ORDER- 1

# I.   INTRODUCTION

Before the court are the following motions:  Plaintiffs Lacey Marketplace Associates II, LLC ("Lacey") and Burlington Retail, LLC's ("Burlington") motion for partial summary judgment regarding the measure of damages (Plf. Mot (Dkt. # 101)); Defendant United Farmer's of Alberta's ("UFA") motion for partial summary judgment (UFA Mot. (Dkt. # 119)); Defendant Sportsman's Warehouses, Inc.'s ("Sportsman") motion for summary judgment (Sports Mot. (Dkt. # 117));  Defendants Alamo Group, LLC ("Alamo"), Wholesale Sports USA, Inc. ("Wholesale"), and Donald Gaube's motion to join UFA's and Sportsman's motions for summary judgment (Joinder (Dkt. # 125)); and UFA's unopposed motion to extend the length of the trial (Mot. to Extend (Dkt. # 121)).  This case concerns two real estate transactions gone awry.  Having considered the submissions of the parties, the balance of the record, and the relevant law, and deeming oral argument unnecessary,[1] the court grants in part and denies in part UFA's motion for partial summary judgment, grants in part and denies in part Sportsman's motion for summary judgment; grants Plaintiffs' motion for partial summary

//

---

[1] No party, with the exception of UFA, requests oral argument.  UFA requests oral argument only with respect to its own motion for partial summary judgment.  (*See* UFA Mot. at 1.)  Oral argument is not necessary where the non-moving party would suffer no prejudice.  *Houston v. Bryan*, 725 F.2d 516, 517-18 (9th Cir. 1984).  "When a party has [had] an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in refusing to grant oral argument]."  *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991)) (alterations in *Partridge* ).  "In other words, a district court can decide the issue without oral argument if the parties can submit their papers to the court."  *Id.*  Here, the issues have been thoroughly briefed by the parties and oral argument would not be of assistance to the court.  Accordingly, the court will not hold oral argument.

1  judgment, strikes Alamo, Wholesale, and Mr. Gaube's motion to join, and denies UFA's

2  motion to extend the trial length.

3            **II.    BACKGROUND**

4            Burlington and Lacey (collectively, "Plaintiffs") own and operate large

5  commercial retail spaces located in Burlington, Washington, and Lacey, Washington,

6  respectively.  (Burlington Lease (Dkt. # 118-4); Lacey Lease (Dkt. # 118-5).)  In 2005

7  and 2006, Burlington and Lacey leased their respective properties to Sportsman, which is

8  a sporting goods chain specializing in hunting, fishing, and camping equipment.

9  (Burlington Lease; Lacey Lease.)  In 2008, UFA accepted 15 of Sportsman's retail stores,

10 including the stores at Lacey and Burlington, as collateral for a loan to Sportsman.

11 (Melynchuk Dep. II (Dkt. # 120-4) at 13:18-17:7); Lacey Assign. (Dkt. # 120-9);

12 Burlington Assign. (Dkt. # 120-23).)  UFA created a wholly-owned subsidiary, originally

13 called UFA Holdings, Inc. ("UFA Holdings"), to accept the collateral.  (Melynchuk Dep.

14 II at 16:24-17:7; Stock Purchase Agreement (Dkt. # 120-11).)  After Sportsman filed for

15 bankruptcy, UFA Holdings, now named Wholesale, assumed control of the collateral and

16 commenced operating the 15 retail stores.  (Not. of Assign. (Dkt. # 120-10).)

17           In 2012, UFA entered into discussions with Sportsman, which had recently

18 emerged from bankruptcy, and with Mr. Gaube and his company Alamo, regarding those

19 stores.  (Melynchuk Dep. II at 128:4-24; LOI (Dkt. # 120-13).)  In February 2013, UFA,

20 Wholesale, Alamo, and Sportsman entered into a Master Transaction Agreement ("the

21 Agreement").  (Agreement (Dkt. # 118-1).)  Under the Agreement, Sportsman purchased

22 Wholesale's assets, including the inventory and fixtures from all 15 of Wholesale's

stores.  (*Id.* at 11.)  Sportsman also assumed the leases for 9 of Wholesale's stores.  (*Id.* at 11, 90.)  Sportsman, however, had no interest in acquiring the remaining 5 leases, which included the Burlington and Lacey leases.  (*Id.* at 96; 11/15/12 Email (Dkt. # 118-7); Eastland Dep. (Dkt. # 118-23) at 28:2-17).)  Accordingly, those leases remained with Wholesale.  (Agreement ¶¶ 11, 90, 96.)

The total purchase price was originally set at $53 million, but later was adjusted to approximately $47 million in order to reflect the actual inventory at closing.  (Agreement at 25, 26; Eastland Dep. II (Dkt. # 118-24) at 325:1-326:15.)  The Agreement provided that Wholesale, upon receiving the purchase price from Sportsman, would immediately transfer the money to UFA.  (Agreement at 31.)  At that point, Wholesale would be left with no assets and the five remaining leases.  (*See generally* Agreement.)  Pursuant to the Agreement, UFA would then transfer all of Wholesale's stock to Alamo for the price of one dollar.[2]  (*Id.*)

The "Closing Date" of the Agreement was set for March 11, 2013.  (Agreement at 1.)  When Lacey and Burlington learned of the Agreement, they initiated lawsuits.[3]  (*See* Lacey Compl. (Dkt. # 1).)  Alamo refused to close the Agreement while litigation was pending, so the parties negotiated an Amendment that provided that UFA and Sportsman would each pay Alamo $214,474.50, or approximately a total of six months of rent for

---

[2] Burlington and Lacey's leases both provided that landlord consent was not required to assign the lease as a result of the sale of the tenant's stock. (1/22/13 Email (Dkt. # 120-15); Burlington Lease ¶ 24.2).)  Lacey's lease provided that landlord consent was not required to assign the lease as a result of the sale of substantially all of the tenant's stock or assets. (Lacey Lease ¶ 24.)

[3] These separate lawsuits were later consolidated into this single action.  (*See* 2/24/14 Order (Dkt. # 71).)

ORDER- 4

1  the Lacey store.  (Amendment (Dkt. # 118-2); Pierce Decl. (Dkt. # 129) Ex. 18 ("2/25/13

2  Email").)  In addition, Sportsman and Alamo executed a side letter agreement ("Side

3  Letter") in which Sportsman agreed to pay Alamo $249,544.28, representing

4  approximately two months of rent for the Burlington store.  (Side Letter (Dkt. # 118-3).)

5  Defendants claim that the purpose of these payments was to enable Alamo to make

6  Wholesale's lease payments until replacement tenants were found.  (*See, e,g.*, Audit

7  Slideshow (Dkt. # 118-14) (listing "$215k for Lacey rent to compensate Alamo while it

8  finds a new tenant for this location" as an "Alamo related closing charge").)  However,

9  no restrictions were placed on the use of these funds.  (*See* Pierce Decl. Ex. 24 ("Gaube

10  Dep.") at 79:17-21 (stating that Alamo was free to use the closing money as it pleased).)

11       All transactions closed on March 11, 2013.[4]  (*See* Agreement.)  After the

12  transactions, Mr. Gaube attempted to arrange replacement leases or purchases of the

13  Lacey and Burlington stores.  (Gaube Decl. (Dkt. # 109) ¶¶ 9-19; Exs. B-H (documenting

14  efforts at procuring new tenants or purchasers).)  When he was unable to do so,

15  Wholesale ceased rental payments to Lacey after April 2013, and ceased rental payments

16  to Burlington after June 2013.  (Dubose Decl. (Dkt. # 115) ¶ 9.)  Meanwhile, Sportsman

17  had stripped the Lacey and Burlington stores of all inventory, furniture, fixtures, and

18  equipment.  (Pierce Decl. Ex. 40 ("3/18/13 Email"); Barrick Rep. (Dkt. # 118-21) at 10-

19  11.)  Eventually, Lacey and Burlington divided each property into two spaces and re-let

20  each property to two different stores.  (2d Dubose Decl. (Dkt. # 124) ¶¶ 43-44.)

21  ――――――――――――――――

22       [4] UFA concedes, however, that there is no evidence Alamo paid UFA the contractual $1 payment
     when it received Wholesale's stock.  (Pierce Decl. Ex. 27 ("8/27/14 Letter").)

1  Specifically, The Sports Authority and Petco signed leases for the Lacey store, and

2  Dick's Sporting Goods and Party City signed leases for the Burlington store.  (*Id.*)

3      In this action, Lacey and Burlington bring breach of contract and

4  misrepresentation claims against Wholesale; tortious interference with contract claims

5  against Alamo, Mr. Gaube, Sportsman, and UFA; fraudulent transfer claims against all

6  defendants; and promissory estoppel and corporate veil-piercing claims against UFA.

7  (Am. Compl. (Dkt. # 73) ¶¶ 26-33.)  The parties have filed multiple motions for summary

8  judgment.  These motions are now before the court.

9              **III.    ANALYSIS**

10     This order addresses the topics raised in the parties' motions in the following

11  order:  (1) motion to join; (2) causes of action; (3) damages; and (4) trial length.  Before

12  reaching these topics, the order sets forth the overarching standard of review on summary

13  judgment.

14  **A.    Summary Judgment Standard**

15     Federal Rule of Civil Procedure 56 permits a court to grant summary judgment

16  where the moving party demonstrates (1) the absence of a genuine issue of material fact

17  and (2) entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S.

18  317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The

19  moving party bears the initial burden of showing the absence of a genuine issue of

20  material fact.  *Celotex*, 477 U.S. at 323.

21     If the moving party does not bear the ultimate burden of persuasion at trial, it can

22  show the absence of an issue of material fact in two ways:  (1) by producing evidence

1    negating an essential element of the nonmoving party's case, or, (2) by showing that the

2    nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan*

3    *Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving

4    party will bear the ultimate burden of persuasion at trial, it must establish a prima facie

5    showing in support of its position on that issue. *UA Local 343 v. Nor-Cal Plumbing, Inc.*,

6    48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that,

7    if uncontroverted at trial, would entitle it to prevail on that issue. *Id*. at 1473.

8        If the moving party meets its burden of production, the burden then shifts to the

9    nonmoving party to identify specific facts from which a factfinder could reasonably find

10   in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby,*

11   *Inc.*, 477 U.S. 242, 252 (1986). In determining whether the factfinder could reasonably

12   find in the nonmoving party's favor, "the court must draw all reasonable inferences in

13   favor of the nonmoving party, and it may not make credibility determinations or weigh

14   the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

15   **B.    Motion to Join**

16       As a preliminary matter, the court addresses Alamo, Wholesale, and Mr. Gaube's

17   attempt to join UFA's and Sportsman's motions for summary judgment. (*See* Joinder.)

18   Plaintiffs move to strike this joinder as untimely. (*See* Mot. to Strike (Dkt. # 131).) The

19   deadline for filing dispositive motions in this case was November 25, 2014. (Sched.

20   Order (Dkt. # 72).) UFA and Sportsman timely filed their motions for summary

21   judgment on November 25, 2014. (*See* UFA Mot.; Sportsman Mot.) Alamo, Wholesale,

22   and Mr. Gaube, however, did not file their motion to join until December 15, 2014. (*See*

1   Joinder.)  The motion to join is equivalent to a stand-alone motion for summary judgment

2   because it concerns different claims and parties and puts forth new evidence (*see* Gaube

3   Decl.).  As such, that motion violates the court's scheduling order.

4         The court issues scheduling orders setting trial dates and related dates to provide a

5   reasonable schedule for the resolution of disputes.  First, the court generally sets the

6   discovery motions deadline 30 days prior to the deadline for discovery to allow the court

7   to resolve the motions within the discovery period.  Second, the court generally sets the

8   discovery cut-off 30 days prior to the deadline for filing dispositive motions in order to

9   ensure that the court has before it a complete record when it considers a motion that could

10  potentially dispose of the case.  Third, the schedule generally provides 90 days between

11  the deadline for filing dispositive motions and the trial date.  This 90-day period takes

12  into account:  (a) an approximate 30-day lag between the date a party files a motion and

13  the date that motion becomes ripe for the court's consideration, *see* Local Rules W.D.

14  Wash. LCR 7(d)(3); and (b) an additional 30 days during which the court endeavors to

15  rule on the motion, *id.* LCR 7(b)(5).  Anything short of a 90-day period leaves inadequate

16  time for the parties to consider the court's ruling and plan for trial or an alternate

17  resolution.

18        The Federal Rules of Civil Procedure provide that a schedule may be modified

19  only for good cause and with the judge's consent.  Fed. R. Civ. P. 16(b)(4).  Alamo,

20  Wholesale, and Mr. Gaube have made no effort to show good cause.  (*See* Joinder.)

21  Their untimely motion to join, which was filed the same day that Plaintiffs' response to

22  UFA's and Sportsman's motions was due, deprived Plaintiffs of the opportunity to

1    address the new arguments raised in the motion to join.  Moreover, their untimely motion

2    to join contravenes the court's scheduling policy:  if Plaintiffs receive the three-week

3    response time they are entitled to, there will be inadequate time for the court to adjudicate

4    the motion for summary judgment, as well as inadequate time for the parties to consider

5    the court's ruling, before trial begins on February 23, 2015.  (*See* Sched. Ord.)  Because

6    Alamo, Wholesale, and Mr. Gaube have not shown good cause for violating the court's

7    scheduling order, the court strikes their motion to join.

8    **C.    Fraudulent Transfer**

9           Turning to the merits, Sportsman moves for summary judgment on Plaintiffs'

10   fraudulent transfer claim.  (Sportsman Mot. at 12.)  "In general, a fraudulent transfer

11   occurs where one entity transfers an asset to another entity, with the effect of placing the

12   asset out of the reach of a creditor, with either the intent to delay or hinder the creditor or

13   with the effect of insolvency on the part of the transferring entity."  *Thompson v. Hanson*,

14   239 P.3d 537, 539 (Wash. 2009).  If a fraudulent transfer has occurred, a creditor can

15   recover judgment against the first transferee to receive the asset from the debtor without

16   regard to the intent of the transferee.  RCW 19.40.081(b); *see also Thompson*, 239 P.3d at

17   541.  Under Washington's version of the Uniform Fraudulent Transfer Act, there are two

18   types of fraudulent transfer:  intentional and constructive.  *Kreidler v. Cascade Nat. Ins.*

19   *Co.*, 321 P.3d 281, 289 (Wash. Ct. App. 2014); *see also* RCW 19.40.041(a); .051(a).  The

20   plaintiff bears the burden of demonstrating intentional fraud by "clear and satisfactory

21   //

22

proof," and of demonstrating constructive fraud by "substantial evidence."[5]  *Clearwater v. Skyline Const. Co.*, 835 P.2d 257, 266 (Wash. Ct. App. 1992); *Kreidler*, 321 P.3d at 289.

### 1.  Constructive fraud

As relevant here, a transfer can be constructively fraudulent in two ways.  First, a transfer is constructively fraudulent if the debtor (1) did not receive a reasonably equivalent value in exchange for the transfer and (2) either was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.  RCW 19.40.041(a)(2)(i), (ii).  Alternatively, a transfer is constructively fraudulent if (1) the debtor did not receive a reasonably equivalent value in exchange for the transfer and (2) the debtor was insolvent at that time or became insolvent as a result of the transfer or obligation.  RCW 19.40.051.

A "transfer" is "every mode . . . of disposing of or parting with an asset."  RCW 19.40.011(12).  An "asset" is any property of the debtor, and a "creditor" is a person who has a right to payment by the debtor.  *Id.* at (2), (3), (4), (5).  Thus, the only transaction relevant to the question of Sportsman's liability for a fraudulent transfer is Sportsman's purchase of Wholesale's inventory and assets—not, as Plaintiffs argue, Alamo's purchase of Wholesale's stock or Wholesale's transfer of the purchase money to UFA.  *See* RCW

---

[5] "Substantial evidence" means "a sufficient quantum of evidence in the record to persuade a reasonable person that the declared premise is true."  *Wenatchee Sportsmen Ass'n v. Chelan Cnty.*, 4 P.3d 123, 126 (Wash. 2000).

19.40.011(2), (3), (4), (5), (12).  As the first transferee to receive Wholesale's assets,

Sportsman could be liable to Plaintiffs.  RCW 19.40.081(b).

Sportsman contends that the transfer was not constructively fraudulent because it

paid approximately $47 million for the assets, and therefore paid a reasonably equivalent

value for the assets.  (Sports Mot. at 12-16.)  Sportsman contends that Plaintiffs have

provided no evidence showing that $47 million does not constitute a reasonably

equivalent value for the assets.[6]  Sportsman's focus on the value it paid, however, is

misplaced.  The crux of the inquiry is the value that Wholesale *received*.  *See* RCW

19.40.041(a)(2)(i), (ii); RCW 19.40.051.  As discussed below, Plaintiffs provide evidence

suggesting that Sportsman transferred the $47 million directly to UFA.  Consequently,

the court concludes that Plaintiffs have raised a question of material fact as to whether

Wholesale received reasonably equivalent value for the assets it transferred to Sportsman.

Specifically, Plaintiffs point to an internal UFA document that summarized the

component parts of the transaction prior to closing.  (UFA Summary[7] (Dkt. # 118-8); *see*

*also* Melnychuk Dep. II at 36:20-37-17 (providing authenticating testimony).)  This

summary states that "[c]losing proceeds to UFA, net of escrow" would be

---

[6] (*See* Barrick Dep. at 31:25-32:20 (stating that, as Plaintiffs' damages expert, she is offering no opinion on the reasonably equivalent value of the purchase price for Wholesale's assets); Resp. to Sport Mot. (Dkt. # 127) at 17-19 (attorney argument comparing the historical cost of the inventory with its retail value, but offering no explanation as to why a retailer should pay another retailer for inventory at the same price that would be charged to end customers).)

[7] It appears that Dkt. # 118-8 contains financial accounting information that should have been redacted pursuant to Local Rule 5.2.  *See* Local Rules W.D. Wash. LCR 5.2(a).  Accordingly, out of an abundance of caution, the court SEALS the exhibit filed at Dkt. # 181-8 pursuant to Local Rule 5(g).  *See* Local Rules W.D. Wash. LCR 5(g).  Sportsman is DIRECTED to file a redacted version of this exhibit that comports with Local Rule 5.2.  *See* Local Rules W.D. Wash. LCR 5.2(a).

1   $45,505,805.37.  (UFA Summary at 2.)  The summary also includes a "Flow Schedule,"

2   which lists the wire transfers scheduled to occur between the parties.  (*Id.* at 3)  The Flow

3   Schedule identifies the account name, bank, routing number, account number, reference

4   field, and amount for each transfer.  (*Id.*)  The first wire transfer of $45,505,805.37 is

5   from an account titled "Sportsman's Warehouse, Inc." directly to an account titled

6   "United Farmers of Alberta Co-Operative Limited." (*Id.*)  The Flow Schedule does not

7   include any transfer to an account held in Wholesale's name.  (*See id.*)

8         Sportsman tries to rebut this evidence in several ways, none of which involves

9   evidence of the actual wire transfer itself.  First, Sportsman points out that the reference

10  field of the wire transfer on the Flow Schedule refers to "UFA HOLDINGS," which is

11  the former name of Wholesale.  (*Id.*; *see also* Dkt. # 132-2 (Certificate of Name

12  Change).)  The significance of the reference field, however, remains unclear to the court.

13  This field is blank for the other wire transfers described on the Flow Schedule.  (*Id.*)

14  Sportsman does not explain why, for this particular transfer, the reference field rather

15  than the name of the account should be relied upon as denoting ownership of the account.

16        Sportsman also provides a document that it claims "demonstrates that the bank

17  account in question is undoubtedly a Wholesale bank account." (Sports Reply (Dkt.

18  # 136) at 7.)  The court disagrees.  All that is known about this document is that it is an

19  "excerpt from a native Excel filed produced by UFA."  (2d Nelson Decl. (Dkt. # 137)

20  ¶ 2.)  With few exceptions, the entirety of the document is redacted.  (UFA Doc. (Dkt.

21  # 137-1).)  The top of the document is labeled "Bank Accounts."  (*Id.*)  There is a

22  heading for "UFA Account," a heading for "WSS," and a heading for "US Bank

Accounts for WSS." (*Id.*)  The single un-redacted entry is for an account ending in "-6106"—the same last four digits as the account titled "United Farmers of Alberta Co-Operative Limited" in the Flow Schedule.  (*Id.*; *see also* Flow Schedule.)  The entry states:  "All 15 WSS stores deposits are swept here then moved to Roynat [sic]."  (*Id.*)  Sportsman does not explain, however, what the purpose of this document is or why a UFA document would include the account number and details of an account allegedly owned and controlled by Wholesale.  As such, this document's evidentiary value is limited.

Finally, Sportsman points to deposition testimony of two persons affiliated with UFA that the purchase money was supposed to be paid to Wholesale.  This testimony, however, is not definitive.  (*See* Melnychuck Dep. II at 268:8-12 ("Q:  At some point in time there was money left in the Utah corporation that subsequently was dividended or distributed up to the parent, fair?  A:  Fair."); Nelson Dep. (Dkt. # 118-32) ("Q:  The money that my client, Sportsman, paid for the inventory and fixtures of the Wholesale stores, was that paid to Wholesale, the U.S. subsidiary to UFA?  A:  I believe it was . . . I do believe it was paid there before money started moving around upon final closing.").)

Although this evidence supports Sportsman's contention that Wholesale received reasonable equivalent value for its transfer, the court cannot say that a reasonable factfinder is required to find that Wholesale received the purchase money.  *See Reeves*, 530 U.S. at 150.  This is particularly true because one more detail from the Flow Chart weighs in Plaintiffs' favor.  Specifically, the Amendment provided that UFA would pay Alamo $214,747.50 to offset the Lacey lease payments.  (Amendment ¶ 5.)  The Flow

ORDER- 13

Chart, however, shows that this money was in fact transferred to Alamo from the same account titled "United Farmers of Alberta Co-Operative Limited" and ending in the digits in "-6106" that received the $45 million from Sportsman.  (Flow Chart at 3.)  The inference that UFA controlled that bank account is at least as reasonable as the inference that Wholesale controlled the account and paid the money to Alamo on behalf of UFA. As such, this fact should be resolved at trial.

In sum, at this stage in the proceedings, the court must draw all reasonable inferences in favor of Plaintiffs and may not weigh the evidence.  *See Reeves*, 530 U.S. at 150.  Because Plaintiff has put forth evidence under which a reasonable factfinder could conclude that Sportsman paid the purchase money to a UFA account, there is a material question of fact as to whether Wholesale received reasonably equivalent value for the transfer of assets.[8]  Therefore, summary judgment on this issue is inappropriate.

For the same reason, the remaining elements of constructive fraudulent transfer remain material questions of fact.  Specifically, if Wholesale did not receive the purchase money after selling all of its inventory and fixtures, a reasonable factfinder could find that Wholesale was engaged or was about to engage in a business or a transaction in

_____

[8] Of the $47 million purchase price that Wholesale was supposed to receive and then transfer to UFA pursuant to the Agreement, $25.6 million of the transfer was to pay off an inventory loan to Wholesale by UFA.  (*See, e.g.*, Barrick Dep. at 25:16-26:13; 29:13-30:1).  Assuming for the sake of argument that Sportsman instead transferred the entire purchase money directly to UFA, the parties dispute whether payment of the loan on behalf of Wholesale constitutes "value" in exchange for the transfer.  The court does not decide the question at this time because even if the $25.6 million loan payment were recognized as consideration to Wholesale, there is no evidence that the consideration constituted reasonably equivalent value for the assets.  Sportsman only maintains that the entire $47 million purchase price was reasonably equivalent value.  (*See* Sports Mot. at 13.)  As such, a $25.6 million direct loan payment in return for the assets would still leave Wholesale undercompensated.

1  relation to which its remaining assets were unreasonably small, or intended to incur, or

2  believed or reasonably should have believed that he or she would incur, debts—namely,

3  the rental payments—beyond its ability to pay.  *See* RCW 19.40.041(a)(2)(i), (ii).

4  Similarly, a reasonable factfinder could find that Wholesale was insolvent at that time or

5  became insolvent as a result of the transfer of assets.  *See* RCW 19.40.051.  Therefore,

6  summary judgment on the constructive fraudulent transfer claim against Sportsman is

7  inappropriate.

8    **2.  Actual intent**

9    A transfer is intentionally fraudulent if the debtor made the transfer with "actual

10  intent to hinder, delay, or defraud any creditor of the debtor."  RCW 19.40.041(a)(1).  In

11  determining actual intent, courts consider whether:

12    (1) The transfer or obligation was to an insider;

13    (2) The debtor retained possession or control of the property transferred
        after the transfer;

14

15    (3) The transfer or obligation was disclosed or concealed;

16    (4) Before the transfer was made or obligation was incurred, the debtor had
        been sued or threatened with suit;

17    (5) The transfer was of substantially all the debtor's assets;

18    (6) The debtor absconded;

19    (7) The debtor removed or concealed assets;

20    (8) The value of the consideration received by the debtor was reasonably
        equivalent to the value of the asset transferred or the amount of the

21      obligation incurred;

22

(9) The debtor was insolvent or became insolvent shortly after the transfer
was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt
was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor
who transferred the assets to an insider of the debtor.

RCW 19.40.041(b).  The relevant question is the debtor's—not the transferee's—intent.

*Id.*  The issue of intent is ordinarily a question of fact for the jury to decide.  *Sedwick v.*

*Gwinn*, 873 P.2d 528, 533 (Wash. Ct. App. 1994).

Sportsman concedes that two of these factors are met:  (1) Wholesale sold all or

substantially all of its assets and (2) litigation was pending at the time of the transfer.

(Sports Mot. at 14.)  Additionally, assuming as the court must for the purposes of

summary judgment, that Sportsman paid the purchase price directly to UFA, at least two

more factors are present:  (3) the value of the consideration Wholesale received was not

reasonably equivalent to the value of the asset transferred and (4) Wholesale was or

became insolvent shortly after the transfer was made.  Moreover, Wholesale denies that it

made the transaction with actual intent to hinder, delay, or defraud Plaintiffs.  (Wholesale

Ans. (Dkt. # 79) ¶ 33.)  Because Plaintiffs have put forth circumstantial evidence of intent

from which a reasonable factfinder could find that Wholesale intended to default on its

rent payments to Plaintiffs by transferring its assets and putting the purchase price out of

reach of Plaintiffs, and because Wholesale denies intent to defraud, the question of intent

is a material question of fact that must be resolved by the factfinder at trial.  *See Sedwick,*

//

ORDER- 16

873 P.2d at 533.  Therefore, summary judgment on the intentional fraudulent transfer

claim against Sportsman is inappropriate.

### 3.  Good faith defense

Ordinarily, a creditor can recover judgment against the first transferee to receive

the asset from the debtor.  RCW 19.40.081(b); *see also Thompson*, 239 P.3d at 541.

However, in a case of intentional fraud, a transferee may avoid a judgment by showing

both that it took the transfer (1) in good faith and (2) for reasonably equivalent value.

RCW 19.40.081(a).  Good faith is defined as:  "(1) An honest belief in the propriety of

the activities in question; (2) no intent to take unconscionable advantage of others; and

(3) no intent to, or knowledge of the fact that the activities in question will, hinder, delay,

or defraud others."  *Sparkman & McLean Co. v. Derber*, 481 P.2d 585, 590-91 (Wash.

Ct. App. 1971) (quoting *Tacoma Ass'n of Credit Men v. Lester*, 433 P.2d 901, 904

(Wash. 1967).  "[I]f any one of these factors is absent, lack of good faith is established

and the conveyance fails."  *Id.*  The burden of establishing this affirmative defense is on

the transferee.  *See State v. Coristine*, 300 P.3d 400, 404 (Wash. 2013).

The court finds that a reasonable factfinder could find that Sportsman had

knowledge of the fact that the activities in question, namely, purchasing all of

Wholesale's assets and paying the purchase price to a third party, would hinder Plaintiffs'

ability to collect rent from Wholesale.  The fact that Sportsman agreed to pay Alamo over

$2 million—approximating a few months rent for the Lacey and Burlington stores—in

order to close the transaction, cuts both ways.  (*See* Amendment; Side Letter.)  Although

the payment suggests Sportsman did not intend for Wholesale to default on its rent

1   payments, it shows that Sportsman was aware that default was likely as a result of the

2   transfer.  This is especially true because Sportsman did not place any restrictions on how

3   Alamo could use the additional closing money, and only provided a few months' worth

4   of rent.  (*See* Pierce Decl. Ex. 24 ("Gaube Dep.") at 79:17-21.)  As such, a material

5   question regarding Sportsman's knowledge exists.  Accordingly, the court does not reach

6   the remaining elements of the good faith defense.  Summary judgment with respect to

7   this defense is unwarranted.

8   **D.      Promissory Estoppel**

9          UFA moves for summary judgment on Plaintiffs' promissory estoppel claim.

10  (UFA Mot. at 13.)  Plaintiffs base their promissory estoppel claim on a provision in

11  Sportman's collateral assignments of the Lacey and Burlington leases to UFA Holdings

12  (now Wholesale) in exchange for a loan.  (Plf. Resp. to UFA (Dkt. # 123) at 15-17.)  The

13  collateral assignments provided that the assignments were not effective unless and until

14  Sportsman either defaulted on the loan or sold the stores to Wholesale, and Plaintiffs

15  received and confirmed a subsequent written "Landlord Notice" of the assignment from

16  Wholesale.  (Lacey Assign. ¶ 2; Burlington Assign. ¶ 2.)  The Plaintiffs consented to the

17  assignments with the following caveat:

18          The undersigned, being the Landlord pursuant to the above-described
        Lease, hereby acknowledges the above assignment and consents thereto;

19      provided, however, that the Landlord's obligation to accept a Landlord
        Notice as described above shall be subject to either (i) the Landlord being

20      provided with satisfactory evidence that, as of the date of the Landlord
        Notice, the Assignee has a net worth of at least $30,000,000, or (ii) the

21      parent of the Assignee, United Farmers of Alberta Co-operative Limited . . .
        has agreed in writing to guarantee to Landlord the payment of the rent and

22      performance of the other obligations required by the Lease . . . ."

(Lacey Assign. at 4-5; Burlington Assign at 4-5.)  In other words, this paragraph provides that, unless Plaintiffs received either (1) evidence that Wholesale had a net worth of $30 million, or (2) a written guarantee from UFA that UFA would guarantee Wholesale's obligations under the leases, they were not obligated to consent to any proposed assignment to Wholesale.

Four months later, in March 2009, Wholesale provided Plaintiffs with the requisite Landlord Notices.  (*See* Not. of Assign.; 2d. Dubose Decl. ¶¶ 10-11.)  It is undisputed that Plaintiffs did not receive a written guarantee from UFA.  Additionally, Plaintiffs contend that they did not receive any evidence regarding Wholesale's net worth at that time.  (*See* 2d. Dubose Decl. ¶¶ 12, 20.)  Nonetheless, Plaintiffs consented to both of the assignments.  (*See id.* Ex. D (letters executing and returning the Lacey Landlord Notice and Burlington Landlord Notice and requesting "either delivery of 'satisfactory evidence' that [Wholesale] has a net worth of $30 million, or a guarantee from the parent company").)

Plaintiffs now argue that, in consenting to these assignments, they relied on a promise by UFA to guarantee Wholesale's lease obligations.  (*See* Plf. Resp. to UFA at 15-17; 2d. Dubose Decl. ¶¶ 21, 49.)  Plaintiffs contend that this promise was conveyed to them in the form of representations by various UFA employees.  (*See* 2d. Dubose Decl. ¶¶ 12-21, Exs. B-G.)

Promissory estoppel requires satisfaction of five elements:  "(1) a promise which (2) the promisor should reasonably expect to cause the promisee to change his position

1    and (3) which does cause the promisee to change his position (4) justifiably relying upon

2    the promise, in such a manner that (5) injustice can be avoided only by enforcement of

3    the promise." *Wash. Educ. Ass'n v. Wash. Dep't of Ret. Sys.*, 332 P.3d 428, 435 (Wash.

4    2014).  The court does not reach the last four elements because the court finds that

5    Plaintiffs' promissory estoppel claim fails at step one:  Plaintiffs are unable to establish

6    the existence of a promise.

7         The Washington Supreme Court defines a promise as "a manifestation of

8    intention to act or refrain from acting in a specified way, so made as to justify a promisee

9    in understanding that a commitment has been made." *Id.*  (quoting Restatement (Second)

10   of Contracts § 2(1) (1981)).  Such a manifestation "must necessarily be explicit rather

11   than implicit." *Tacoma Auto Mall, Inc. v. Nissan N. Am., Inc.*, 279 P.3d 487, 496 (Wash.

12   Ct. App. 2012).  Accordingly, promissory estoppel requires the existence of a "clear and

13   definite" promise. *Havens v. C & D Plastics, Inc.*, 876 P.2d 435, 444 (Wash. 1994).

14        Plaintiffs, however, put forth no evidence of a clear and definite promise by UFA

15   to guarantee Wholesale's obligations.  Instead, Plaintiffs rely on several correspondences

16   with UFA employees in which Plaintiffs repeatedly requested Wholesale's financial

17   information.  In response, the employees informed Plaintiffs that Wholesale was a newly

18   created company that lacked historical financial information, and then offered various

19   financial information about UFA instead.  (*See* 2d. Dubose Decl. Ex. B (May 2009 email

20   from a UFA transactional analyst directing Plaintiffs' to financial data located on UFA's

21   website), Ex. F (email from a risk and information manager at UFA stating:  "We can

22   provide an organizational chart, however, regarding the financials, UFA Holdings Inc.

1  was just created and hence has no financial history.  We will send the financials for the

2  parent company-UFA . . . $2 billion in sales, etc."), Ex. G (email from UFA's claims

3  coordinator for risk and information management replying to a request for UFA Holdings

4  financials with a link to UFA's annual reports).)  Plaintiffs also rely on the fact that UFA

5  made all of Wholesale's rental payments, and that "any significant conversation or

6  business conversation was with UFA employees," rather than Wholesale employees.  (2d.

7  Dubose Decl. ¶¶ 18-19.)  Plaintiffs conclude that "[t]his information, along with other

8  actions by UFA, lead [sic] us to believe that UFA was guaranteeing the actions of its

9  subsidiary."  (*Id.* ¶ 21.)  Be that as it may, "although promissory estoppel may apply in

10  the absence of mutual assent or consideration, the doctrine may not be used as a way of

11  supplying a promise."  *Havens*, 876 P.2d at 443.  Yet that is exactly what Plaintiffs try to

12  do here.  The case law is clear that, for the purposes of promissory estoppel, a promise

13  must be explicit, rather than implied.  *See Tacoma Auto Mall, Inc.*, 279 P.3d at 496.

14  None of the statements identified by Plaintiffs, however, rises to the level of a "clear and

15  definite" manifestation of UFA's intent to guarantee Wholesale's obligations of the

16  leases.  *See Havens*, 876 P.2d at 444.  The mere fact that UFA employees referred

17  Plaintiffs to UFA's financial information when asked for Wholesale's information does

18  not constitute a promise that UFA would guarantee Wholesale's specific lease

19  obligations.  Because Plaintiffs cannot show a promise, their claim for promissory

20  estoppel necessarily fails.  Summary judgment in favor of UFA is appropriate.  *See*

21  *Nissan Fire*, 210 F.3d at 1106.

22

**E.   Piercing the Corporate Veil**

UFA moves for summary judgment on the claim that the corporate veil between Wholesale and UFA should be pierced.  (UFA Mot. at 18.)  A corporate entity may be disregarded and liability imposed against its shareholders when the corporation has been intentionally used to violate or evade a duty owed to another.  *Meisel v. M & N Modern Hydraulic Press Co.*, 645 P.2d 689, 692 (Wash. 1982).  "This may occur either because the liability-causing activity did not occur only for the benefit of the corporation, and the corporation and its controllers are thus 'alter egos,' . . . or because the liable corporation has been 'gutted' and left without funds by those controlling it in order to avoid actual or potential liability . . . ."  *Morgan v. Burks*, 611 P.2d 751, 755 (Wash. 1980).  In either case, there are two essential factors:  "First, the corporate form must be intentionally used to violate or evade a duty; second, disregard must be necessary and required to prevent unjustified loss to the injured party."  *Id.*

With regard to the first element, the court must find an abuse of the corporate form.  *Id.*  Such abuse typically involves "fraud, misrepresentation, or some form of manipulation of the corporation to the stockholder's benefit and creditor's detriment."  *Id.*  The Washington Supreme Court has identified the following factors relevant to determining this element, including, but not limited to:  commingling of funds and other assets; identity of officers and directors; full ownership by the parent; the failure to adequately capitalize a corporation; the absence of corporate assets, and undercapitalization; the use of a corporation as a mere shell, instrumentality or conduit for a single venture of another corporation; the diversion of assets from a corporation by

1  or to a stockholder or other person or entity, to the detriment of creditors; or the

2  manipulation of assets and liabilities between entities so as to concentrate the assets in

3  one and the liabilities in another.  Thomas V. Harris, *Washington's Doctrine of*

4  *Corporate Disregard*, 56 Wash. L. Rev. 253, 276 n.38 (1981) (quoted by *Meisel*, 645

5  P.2d at 692).

6      With regard to the second element, "wrongful corporate activities must actually

7  harm the party seeking relief so that disregard is necessary." *Meisel*, 645 P.2d at 692

8  "Intentional misconduct must be the cause of the harm that is avoided by disregard." *Id.*

9  Finally, "[t]he question whether the corporate form should be disregarded is a question of

10  fact." *Norhawk Investments, Inc. v. Subway Sandwich Shops, Inc.*, 811 P.2d 221, 222

11  (Wash. Ct. App. 1991).

12      Plaintiffs contend that they have raised enough evidence regarding the first

13  element's factors to survive summary judgment on that element.  The court agrees.

14  Specifically, taking the evidence in the light most favorable to Plaintiffs, Plaintiffs show

15  that Wholesale was a wholly owned subsidiary of UFA; Wholesale was undercapitalized

16  during the relevant time; Wholesale and UFA's funds were intermingled in at least one

17  bank account; UFA employees answered inquiries regarding Wholesale's financial

18  information with UFA's financial information; UFA employees handled all serious

19  business conversations regarding Wholesale; UFA diverted assets from Wholesale to

20  UFA to the detriment of Plaintiffs; and UFA manipulated the assets and liabilities

21  between Wholesale and UFA so as to concentrate the proceeds of the asset sale with UFA

22  and the lease liabilities with Wholesale.  (*See supra* § II.)  Weighing these factors, a

1   reasonable jury could find that UFA intentionally abused the corporate form in order to

2   avoid lease obligations to Plaintiffs.  *See Meisel*, 645 P.2d at 692.

3     A difficulty arises, however, with respect to the second element.  Plaintiffs claim

4   that they were harmed because they stopped receiving rental payments from Wholesale

5   and Wholesale did not possess any inventory, furniture, fixtures, or equipment on which

6   they could affix a landlord's lien.  (Plf. Resp. to UFA at 13.)  By the time Wholesale

7   stopped paying rent, however, Wholesale was wholly owned by Alamo—not by UFA.

8   (Agreement ¶ 2.2.)  Plaintiffs cite no authority for their contention that UFA can be held

9   responsible for liability that its former subsidiary incurred after the subsidiary was owned

10  by a separate entity.  After all, at that point in time, Wholesale could no longer fairly be

11  described as UFA's "alter ego."  *See J. I. Case Credit Corp. v. Stark*, 392 P.2d 215, 218

12  (1964) (holding that "to enable a court to declare two corporations to be identical in

13  responsibility . . . there must be such a commingling of property rights or interests as to

14  render it apparent that they are intended to function as one").  Plaintiffs, however, point

15  to no harm that occurred during the time that UFA and Wholesale were allegedly

16  operating as single enterprise.

17    Plaintiffs contend that, because UFA's previous disregard for Wholesale's

18  corporate form is the but-for cause of Wholesale's subsequent default, UFA should be

19  liable for that default.  (Plf. Resp. to UFA at 12-14.)  The Washington Supreme Court has

20  made clear, however, that the "general rule" that a parent corporation is not liable for the

21  acts of its subsidiaries is set aside only in "certain exceptional cases."  *Culinary Workers*

22  *& Bartenders Union No. 596 Health & Welfare Trust v. Gateway Cafe, Inc.*, 588 P.2d

ORDER- 24

1  1334, 1343 (1979).  This court declines to extend that exception to hold a parent

2  corporation liable for the acts of a non-subsidiary.  *See Meisel*, 645 P.2d at 693.

3  ("Separate corporate entities should not be disregarded solely because one cannot meet its

4  obligations.").  Therefore, UFA is entitled to summary judgment on Plaintiffs' veil-

5  piercing claim.[9]

6  **F.    Tortious Interference with Contract**

7        Sportsman and UFA move for summary judgment on the tortious interference with

8  contract claims against them.  (Sportsman Mot. at 12; UFA Mot. at 16.)  "A claim for

9  tortious interference with a contractual relationship or business expectancy requires five

10  elements:  (1) the existence of a valid contractual relationship or business expectancy; (2)

11  that defendants had knowledge of that relationship; (3) an intentional interference

12  inducing or causing a breach or termination of the relationship or expectancy; (4) that

13  defendants interfered for an improper purpose or used improper means; and (5) resultant

14  damage."  *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997).

15  Interference for an "improper purpose" means interference with the intent to harm the

16  plaintiff or for some other improper objective, such as hostility or retaliation.  *See Pleas*

17  *v. City of Seattle*, 774 P.2d 1158, 1163 (Wash. 1989); *Elcon Const., Inc. v. E. Wash.*

18  *Univ.*, 273 P.3d 965, 971 (Wash. Ct. App. 2012).  Interference by "improper means"

19  includes interference that is "wrongful by reason of a statute or other regulation, or a

20  _____

21        [9] Plaintiffs also bring a declaratory judgment claim asking the court to "declare that United Farmers of Alberta Co-Operative Limited is liable for the obligations of Wholesale Sports USA pursuant to the Leases." (Am. Compl. ¶ 32).  Because Plaintiffs have advanced no other theory, besides veil-

22  piercing, as to why UFA should be liable for Wholesale's lease obligations, UFA is also entitled to summary judgment on Plaintiffs' declaratory judgment claim.

recognized rule of common law, or an established standard of trade or profession."

*Pleas*, 774 P.2d at 1163.  Exercising one's legal interests in good faith is not improper

interference.  *Leingang*, 930 P.2d at 300.

The parties do not dispute that the first two elements are met.  (*See generally* Sport

Mot.; UFA Mot.)  With respect to the third and fourth elements, both UFA and

Sportsman contend that Plaintiffs can show neither that they intentionally interfered to

cause Wholesale to breach its leases with Plaintiffs nor that they had an improper purpose

or used improper means.  (*See* Sport Mot.; UFA Mot.)

**1.  Sportsman**

The court does not reach the issue of intentional interference by Sportsman

because, even assuming such interference, Plaintiffs are unable to show the fourth

element:  that Sportsman interfered for an improper purpose or used improper means.

*See Leingang*, 930 P.2d at 300.

Turning first to use of improper means, Plaintiffs put forth no evidence showing

that Sportsman's transaction with Wholesale was "wrongful by reason of a statute or

other regulation, or a recognized rule of common law, or an established standard of trade

or profession."  *See Pleas*, 774 P.2d at 1163.  To the contrary, Wholesale's leases

expressly permitted a sale of assets without consent by the landlord Plaintiffs.  (*See*

Lacey Lease ¶ 25; Burlington Lease ¶ 25.)  It is well established that "exercising one's

legal interests in good faith is not improper interference."  *See Leingang*, 930 P.2d at 300.

As such, purposefully structuring the transaction to avoid consent provisions in the leases

does not constitute use of improper means.  (*See* Dkt. ## 129-12, -13, (emails discussing

1   how to structure the transaction to avoid the consent provision)); *Goodyear Tire &*

2   *Rubber Co. v. Whiteman Tire, Inc.*, 935 P.2d 628, 636 (Wash. Ct. App. 1997) (finding no

3   tortious interference where the contract explicitly permitted the action in question).

4          Turning next to improper purpose, Plaintiffs put forth no evidence showing that

5   Sportsman intended to harm Plaintiffs or acted with some other improper objective, such

6   as hostility or retaliation.  *See Pleas*, 774 P.2d at 1163; *Elcon Const., Inc.*, 273 P.3d at

7   971.  Plaintiffs' showing that (1) Sportsman's attorneys drafted the Master Transaction

8   Agreement and First Amendment (Pierce Decl. Ex. 11 ("Eastland Dep.") at 57:22-58:5;

9   101:18-22; 171:24-172:8); (2) Sportsman knew that the entire purchase price would

10  ultimately be transferred to UFA, rather than Wholesale (*see* Agreement); (3) Sportsman

11  knew Plaintiffs were concerned about the Agreement (Pierce Decl. Ex. 17 (2/13 emails

12  between Plaintiffs and UFA); (4) Sportsman paid Alamo over $ 2 million to ensure the

13  deal closed (Side Letter; Amendment); and (5) Sportsman recognized that Alamo's

14  conduct regarding the rental payments was a risk to the transaction (Pierce Decl. Ex. 16

15  ("Eastland Dep. II") at 68:11-18).  These facts, however, are insufficient to show

16  improper purpose.[10]  At best, taken as true, these facts tend to show that Sportsman was

17  aware that the Master Transaction Agreement would place Plaintiffs' leases in jeopardy.

18  Yet the Washington Supreme Court has made clear that intent to interfere with a contract

19  is a separate and distinct element from improper purpose in interfering.  *See, e.g.*,

20  _____

21          [10] For its part, Sportsman puts forth evidence showing that its purpose for purchasing some of
    Wholesale's stores and not others was based on an assessment of the locations of Sportsman's existing
    stores, competitor' stores, and planned future locations, as well as the individual regional markets for
22  Sportsman's goods.  (Eastland Dep. III (Dkt. # 118-23) at 27:16-28:25.)

1    *Commodore v. Univ. Mech. Contractors, Inc.*, 839 P.2d 314, 322 (Wash. 1992), *amended*

2    (Nov. 18, 1992); *Pleas*, 774 P.2d at 1163; *Leingang*, 930 P.2d at 300.  A "plaintiff must

3    show not only that the defendant intentionally interfered with his business relationship,

4    but also that the defendant had a 'duty of non-interference.'"  *Pleas*, 774 P.2d at 1163.

5    Plaintiffs have not raised any evidence suggesting that Sportsman was anything but

6    indifferent to Wholesale's ability to perform on its lease obligations to Plaintiffs.  A

7    factfinder would have to resort to improper speculation in order to find otherwise.  *See*

8    *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) ("[A jury] is

9    permitted to draw only those inferences of which the evidence is reasonably susceptible;

10   it may not resort to speculation.").  Without evidence of an improper purpose, Plaintiffs

11   cannot prevail on their tortious interference with contract claim.  *See Pleas*, 774 P.2d at

12   1163.  As such, summary judgment in Sportsman's favor on the intentional interference

13   with contract claim is appropriate.  *See Nissan Fire*, 210 F.3d at 1106.

14        **2.  UFA**

15        Plaintiffs have set forth adequate evidence to support a finding that UFA

16   intentionally interfered with Plaintiffs' leases and that UFA was motivated by an

17   improper purpose in doing so.  Specifically, Plaintiffs put forth evidence tending to show

18   that (1) UFA controlled Wholesale's business dealings (*see* Section III.E (listing factors

19   showing UFA's potential abuse of the corporate form)); (2) UFA sold all of Wholesale's

20   assets and pocketed the money for itself (Pierce Decl. Exs. 32, 33 (UFA emails

21   discussing "the best way to distribute the proceeds back to the parent")); (2) UFA agreed

22   to sell Wholesale's then-worthless  stock to Alamo for $1, which it did not even bother to

1   collect (Agreement; 8/27/14 Letter); (3) UFA recognized that Alamo's inability to make

2   the rental payments could render the transaction a "sham" (Pierce Decl. Ex. 129-1

3   ("3/8/13 Email"), Ex. 33 ("1/18/13 Board Minutes"), Ex. 34 ("1/16/13 Board Minutes");

4   and (4) nonetheless, UFA asked Alamo to help it "get out of" Wholesale's leases (*id.* Ex.

5   15 ("1/17/14 Email").

6          This evidence, viewed in the light most favorable to Plaintiffs, shows that UFA

7   purposefully removed all value from Wholesale, recognized that Wholesale was unable to

8   perform on the leases as a result, and then transferred Wholesale to Alamo, who was also

9   unable to perform on the leases, for free in order to avoid potential liability for the leases.

10  In sum, UFA did not merely divest itself of its investment in sporting good stores—

11  rather, it purposefully orchestrated the transaction to leave Plaintiffs with a judgment-

12  proof debtor unable to meet the remaining lease obligations.  A reasonable factfinder

13  could find intentional interference for an improper purpose based on these facts.

14         UFA argues that the record shows that UFA expected Alamo to purchase or find

15  new tenants to fill the leases (1/18/12 Board Minutes; 1/16/13 Board Minutes; Pierce

16  Decl. Ex. 36 ("2/27/13 Email")); 2/25/13 Email (Dkt. # 118-12) ("Alamo specializes in

17  redeveloping/re-leasing/buying underperforming properties and leases"); that Alamo

18  intended to turn a profit on the transaction by finding new tenants (Gaube Dep. (Dkt.

19  # 118-27) at 223:15-224:10; 290:8-291:8; Gaube Decl.  ¶¶ 9-19; Exs. B-H); and that

20  UFA gave additional money to help Alamo make a few lease payments while searching

21  for new tenants (Amendment; Eastland Dep. III at 175:7-25; Audit Slideshow; *but see*

22  Gaube Dep. at 79:17-21.)  These facts suggest that UFA did not act with an improper

1   purpose.  A court, however, may not weigh the evidence on a motion for summary

2   judgment.  *Reeves*, 530 U.S. at 150.  Plaintiffs have raised material questions of fact

3   regarding UFA's intentional interference and improper purpose.  As such, summary

4   judgment on Plaintiffs' intentional interference claim is improper.

5   **G.    Damages**

6       **1.  Consequential damages**

7       After Wholesale defaulted on the lease obligations, Plaintiffs "decided [their] best

8   option was to divide the space and obtain two tenants for each location."  (2d. Dubose

9   Decl. ¶ 42.)  Plaintiffs allege that they spent over $3.6 million to divide and install tenant

10  improvements in the Lacey property and over $5.1 million to divide and install tenant

11  improvements in the Burlington property.  (*Id.* ¶ 43.)  Plaintiffs contend that they

12  incurred those "re-leasing" expenses in order to mitigate their damages, and that they are

13  therefore entitled to recover those amounts as consequential damages that were

14  reasonably foreseeable from Wholesale's breach of the lease.  (Plf. Mot. at 6.)  Sportsman

15  argues that Plaintiffs are not entitled to recover those expenses because they were not

16  necessary mitigation expenses.

17      The parties agree on the applicable law.  "[D]amages which a lessor may recover

18  for breach of a lease may properly include consequential damages which flow from the

19  breach and which could reasonably have been anticipated by the parties." *Family Med.*

20  *Bldg., Inc. v. State, Dep't of Soc. & Health Servs.*, 702 P.2d 459, 464 (Wash. 1985).

21  "The amount of damages should reflect what is required to place the lessor in the same

22  financial position he would have enjoyed in the absence of the breach."  *Id.*  In *Family*

ORDER- 30

1   *Medical*, the Washington Supreme Court found that "the premises were specifically

2   designed and improved for the exclusive benefit of the [Defendant] and necessarily had

3   to be remodeled in order that they be marketable to a new tenant." *Id.* The Court held:

4   "To the extent these costs were expenses of mitigation and not capital improvements for

5   the benefit of the new tenant, they are recoverable." *Id.*

6          Sportsman contends that Plaintiffs' construction expenses were in reality capital

7   improvements for the benefit of Plaintiffs' new tenants because (1) the expenditures

8   would have been required at the end of Wholesale's leases even absent Wholesale's

9   breach, and (2) the expenditures will be recouped over the life of Plaintiffs' current leases

10  with the new tenants.  (Sports Mot. at 19-20.)  Plaintiffs, however, put forth evidence

11  showing that, just as in *Family Medical*, the Lacey and Burlington properties were

12  specifically designed for the exclusive benefit of Wholesale's (previously Sportsman's)

13  sporting good stores, and necessarily had to be remodeled in order to be marketable to

14  new tenants.  (*See, e.g.*, 2d Dubose Decl. ¶ 47 ("When [Sportsman] executed the leases in

15  2005 and 2006, these were build-to-suit buildings to the exact specifications of

16  [Sportsman]".); *id.* ¶ 42 ("Due to the size of the building at Burlington and the building at

17  Lacey, we were limited in options for potential tenants."); *id.* ¶ 46 ("We would not have

18  been able to obtain viable replacement tenants without incurring these costs.").)  The

19  court does not opine whether all or some of Plaintiff's expenditures constitute reasonable

20  mitigation expenses.  At this stage, it is enough that Sportsman has put forth sufficient

21  evidence to raise a material question of fact regarding the amount of damages.  As such,

22

1   summary judgment regarding consequential damages is not appropriate.  *See Nissan Fire*,

2   210 F.3d at 1106.

3      **2.  Burlington's consequential damages**

4      UFA and Sportsman claim that the Burlington lease limits the type and amount of

5   consequential damages recoverable by Burlingtion.  (UFA Mot. at 20; Sports Mot. at 20.)

6   Section 22.2 of the Burlington lease concerns the remedies for material default by the

7   tenant.  (*See* Burlington Lease ¶ 22.2.)  This section provides that, in the event of a

8   breach by the tenant, the landlord may re-let all or part of the property, and that any

9   resulting rent received by the landlord will be applied in the order set forth in the

10  following subsections.  (*Id.*)  The following subsections state:

> 22.2.1 Cost of Reletting. Landlord shall first pay any brokerage fees or commissions paid to a third party broker for such reletting ("Reletting Costs"), provided, however, that the Reletting Costs payable by Tenant shall be limited to a fraction of the total Reletting Costs, the numerator of which is the number of months remaining in the ten-exercised Term of this Lease as of the commencement date of the relet lease and the denominator of which is the total number of months in the term of the relet lease. The parties hereby specifically confirm that Relettting Costs will only include the brokerage fees or commissions described in the first sentence of this Section 22.2.1 and no other costs will be so included in Reletting Costs.
>
> 22.2.2 Other Indebtedness. Secondly, Landlord shall pay any unpaid indebtedness other than Rent due from Tenant to Landlord pursuant to this Lease.
>
> 22.2.3 Rent. Landlord shall pay Rent and other charges due and unpaid pursuant to this Lease.
>
> 22.2.4 Residue. The residue, if any, shall be held by Landlord and applied to the payment of any future amounts that become due and payable pursuant to this Lease.

22  (*Id.* ¶¶ 22.2.1-.4.)

1        UFA and Sportsman contend that, because Section 22.2.1 defines "Reletting

2   Costs" to include only "brokerage fees or commissions paid to a third party broker,"

3   Burlington is not entitled to recover any other type of cost incurred as a result of re-

4   letting the property.  (UFA Mot. at 20; Sports Mot. at 20.)  This position is not well

5   taken.  Nowhere does the lease state that Burlington's damages are *limited* to the

6   "Reletting Costs" defined in Section 22.2.1.  Rather, Section 22.2.1 merely defines which

7   fraction of brokerage fees or commissions incurred during re-letting may be recovered by

8   Burlington.  Moreover, Section 22.2.1 expressly provides that no other costs besides the

9   described brokerage fees and commissions will be included in the fractionalized, so-

10  called "Relettting Costs."  (Burlington Lease ¶ 22.2.1.)  Further belying UFA and

11  Sportsman's position, Section 22.2.2 expressly provides for "other indebtedness" due by

12  the tenant pursuant to the lease to be paid in full.  (*Id.* ¶ 22.2.2.)

13       In short, UFA and Sportsman's attempt to transform Section 22.2.1 into a

14  liquidated damages or waiver of damages clause is not supported by the plain language of

15  the clause or by the remainder of the lease.  A landlord may recover the common law

16  remedy of consequential damages reasonably flowing from the breach of a lease even

17  where the lease does not explicitly provide for consequential damages.  *See Peyton Bldg.,*

18  *LLC v. Niko's Gourmet, Inc.*, 323 P.3d 629, 635 (Wash. Ct. App. 2014); *Family Med.*

19  *Bldg., Inc.*, 702 P.2d at 464.  Accordingly, the court denies UFA and Sportsman's

20  motions for summary judgment regarding Burlington's consequential damages.

21  //

22  //

### 3. Market value offset

Plaintiffs move for partial summary judgment regarding the measure of damages. (*See* Plf. Mot.)  Specifically, the parties dispute whether Defendants are entitled to offset the Lacey and Burlington properties' subsequent increases in market value against Plaintiffs' damages.[11] (*See id.*; UFA Resp. (Dkt. # 110).)  The appropriate measure of damages is a matter of law for the court to decide.  *Shoemake ex rel. Guardian v. Ferrer*, 225 P.3d 990, 992 (Wash. 2010)

UFA proffers expert testimony that the "value of each property increased significantly from the releasing of the stores to new replacement tenants."  (Robinson Rep. (Dkt. # 112-1) at 5-10.)  UFA's experts attribute this market value increase to the facts that (1) the new tenants are healthier businesses than Wholesale Sports, which had been performing poorly in the sporting goods market, and (2) Plaintiffs are now receiving overall higher rental income from the combination of new tenants than they received from Wholesale.  (Weisfield Rep. (Dkt. # 113-1) at 5-6; Robinson Rep. at 9-12; *see also* Robinson Rebuttal Rep. (Dkt. # 112-1) at 3.)  UFA concludes that the increase in market

---

[11] UFA moves to strike portions of the Kindley declaration and accompanying exhibits filed in support of Plaintiffs' motion for partial summary judgment.  (UFA Resp. to Plf. (Dkt. # 110) at 3.)  UFA claims that Mr. Kindley does not have the personal knowledge necessary to authenticate the documents.  (*Id.*)  In response, Plaintiffs filed a declaration by Mack Dubose, one of Lacey and Burlington's owners, who properly authenticates the same documents and testifies to the facts in question.  (*See generally* DuBose Decl.)  Plaintiffs also point out that these documents were previously used by UFA's counsel during various depositions.  (Plf. Reply (Dkt. # 114) at 3.)  Because the court does not rely on the Kindley declaration or exhibits to decide Plaintiffs' motion, because Mr. Dubose has now authenticated or testified to the documents and facts in question, and because UFA cannot show prejudice regarding documents that were previously authenticated in its own depositions, the court DENIES UFA's motion to strike as moot.

Similarly, the court DENIES as moot UFA's motion to strike the portions of Plaintiffs' motion that recite facts without citation to any evidence.  The court does not rely on these portions to adjudicate the motion for partial summary judgment.

1  value, after subtracting "reasonable" re-letting costs and lost rental payments, actually

2  results in a net gain for Plaintiffs due to the breach.  (Robinson Rep. at 9-12; *see also*

3  Weisfield Rep. at 5.)

4         Defendants, however, fail to cite any authority supporting their position that the

5  calculated market value of the rental properties should be subtracted from the monetary

6  damages Plaintiffs have sustained.  Rather, their responses to Plaintiffs' motion consist of

7  a series of red herrings.

8         First, Defendants argue that they are entitled to put forth evidence showing that

9  Plaintiffs' construction costs are capital improvements, rather than mitigation expenses,

10  because the improvements are permanent in character and increase the value of the

11  property.  (*See* UFA Resp. to Plfs. at 10-12 (citing multiple out-of-circuit cases defining

12  capital improvements); *see generally* Alamo Resp. (Dkt. # 106).)  This argument is

13  nonresponsive.  Plaintiffs' motion does not implicate Defendants' ability to contest at

14  trial whether Plaintiffs' construction costs qualify as consequential damages.  (*See* Plf.

15  Reply (Dkt. # 114) at 3-5.)  Moreover, the mere fact that expenses for capital

16  improvements are unrecoverable does not mean that the resulting increase in market

17  value should be subtracted from damages actually incurred as a result of the breach.

18         Second, Defendants argue that they are entitled to put forth evidence that Plaintiffs

19  failed to mitigate their damages.  (UFA Resp. to Plfs. at 15-16.)  This argument is also

20  nonresponsive.  Plaintiffs' motion does not prevent Defendants from arguing for an offset

21  due to Plaintiffs' alleged failure to mitigate damages.  (Plf. Reply at 3-5.)  Rather, this

22  motion concerns only an offset due to increased market value.  (*Id.*)

1    Third, Defendants point out the leases specify, in the event of a breach, the order

2    in which money received from re-letting the premises should be applied to the tenants'

3    debts.  (UFA Mot. at 13; *see also* Burlington Lease at ¶ 22.2; Lacey Lease at ¶ 22.2.)

4    Defendants argue that, as a result of these lease provisions, Plaintiffs have "an obligation

5    to 'offset' their alleged losses with sums actually received, from any replacement

6    tenants," including, presumably, retrospectively applying the increased rental income

7    from the replacement tenants to Wholesale's debts.  (UFA Mot. at 13); *see generally*

8    *Hargis v. Mel-Mad Corp.*, 730 P.2d 76, 80 (Wash. Ct. App. 1986) (discussing whether

9    future rents should be offset against a breaching tenant's debts).  The court does not

10    address the validity of Defendants' contention because it is inapposite to Plaintiffs'

11    motion.  Plaintiffs ask for a ruling that Defendants are not permitted to offset the

12    calculated market value of the property, which is not a "sum actually received."  The

13    leases, however, only address payments actually received by Plaintiffs.  (*See* Burlington

14    Lease ¶ 22.2; Lacey Lease ¶ 22.2)

15    Fourth, Defendants cite precedent establishing that the damages for a failure to

16    comply with the repair and restoration clauses of a lease is calculated as the resulting

17    diminution of the market value of the property or the amount necessary to repair the

18    property, whichever is less.  *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 798 P.2d 799,

19    801 (Wash. 1990).  That caselaw is inapposite to Plaintiffs' claims, which concern failure

20    to pay rent, not failure to upkeep the property itself.

21    Finally, Defendants rely on the principle that, although the "amount of damages

22    should reflect what is required to place the lessor in the same financial position he would

1    have enjoyed in the absence of the breach," *Family Med. Bldg.*, 702 P.2d at 464, the

2    plaintiff is not "entitled to more than he would have received had the contract been

3    performed," *Platts v. Arney*, 309 P.2d 372, 375 (Wash. 1957).  However, far from

4    advancing this tenant of contract law, Defendants' proposed offset would militate against

5    it.

6           The parties agree that, in general, *Family Medicine* sets forth the appropriate

7    standard of damages for a breached lease of real property.  (*See* UFA Resp. to Plfs. at 19;

8    Plfs. Resp. to Sports at 20.)  *Family Medicine* provides that, where a lessor has made

9    reasonable efforts to mitigate and is successful in re-letting the premises, the lessor is

10   "entitled to recover the contract rental for the period reasonably necessary to re-rent the

11   premises plus the difference, if any, between the new and the original rents for the

12   [remaining] lease term."  *Family Med. Bldg.*, 702 P.2d at 464; *see also Crown Plaza*

13   *Corp. v. Synapse Software Sys., Inc.*, 962 P.2d 824, 828 (Wash. Ct. App. 1997).

14   "Additional damages which a lessor may recover for breach of a lease may properly

15   include consequential damages which flow from the breach and which could reasonably

16   have been anticipated by the parties."  *Id.*  Specifically, to the extent remodeling costs

17   "were expenses of mitigation and not capital improvements for the benefit of the new

18   tenant, they are recoverable."  *Id.*

19          In *Family Medicine*, the Washington Supreme Court makes no mention of an

20   offset in the tenant's favor for any increase in market value provided by the replacement

21   leases.  Rather, the Washington Supreme Court focuses on the lessor's actual inflows and

22   outflows of cash caused by the breach.  After all, a lessor would only recognize the

1  estimated increase in market value if it sold the property in question.  As it stands,

2  Plaintiffs are still short millions of dollars in missed rental payments and mitigation costs

3  incurred due to the breach.  (2d Dubose Decl. ¶¶ 43-44.)  But a "landlord should not be

4  made to bear immediate out-of-pocket losses" in the name of a speculative future benefit.

5  *Hargis*, 730 P.2d at 81.

6       Not only would permitting Defendants to offset the increased calculated market

7  value of the property against the actual losses Plaintiffs sustained under-compensate

8  Plaintiffs, but it would effectively reward a breaching tenant for its poor performance.

9  After all, UFA's experts admit that the estimated market value increased due in part to

10  the strong business credentials of the new tenants.  (*See* Weisfield Rep.; Robinson Rep.)

11  But "the defaulting tenant should not get the benefit of the breach."  *Hargis*, 730 P.2d at

12  81.  The fact that a landlord was able to re-let the properties to a financially sound tenant

13  should not absolve the breaching tenant from its responsibility to make the landlord

14  whole for the actual losses incurred due to its breach.

15       For these reasons, the court grants Plaintiffs' motion for partial summary judgment

16  regarding damages.  Defendants are not entitled to offset any increase in market value of

17  the properties against the damages owed for breach of contract.

18       The parties' briefing evinces confusion as to the result that this ruling will have on

19  the trial.  According, the court clarifies:  This ruling does not prevent Defendants from

20  arguing and putting forth evidence to show that Plaintiffs neglected to mitigate their

21  damages by failing to re-let the properties in a timely manner.  Neither does this ruling

22  prevent Defendants from arguing and putting forth evidence to show that all or some

1   Plaintiffs' claimed construction costs do not constitute consequential damages. These

2   issues remain questions of fact for the jury to determine.

3        Defendants will not, however, be permitted to put forth evidence of increased

4   market value for the purpose of arguing that Plaintiffs have suffered no damages, or for

5   the purpose of arguing that such alleged increases should be offset against Plaintiffs'

6   damages. Neither will Defendants be permitted to put forth evidence of any increased

7   market value allegedly due to the new leases or the improved quality of the replacement

8   tenants. Finally, this ruling does not prevent Plaintiffs from introducing evidence

9   showing increases in market value of the property attributable to specific construction

10   projects (as opposed to the new leases or tenants) for the limited purpose of showing

11   whether the resulting claimed construction cost was a capital improvement or a

12   mitigation expense. *See Family Med. Bldg.*, 702 P.2d at 464. Defendants, however, are

13   not entitled to an offset based on the increased market value allegedly attributable to

14   those construction projects.

15      **4. Attorneys' fees**

16        UFA and Sportsman contend that, if Plaintiffs prevail at trial, Plaintiffs are not

17   entitled to recover attorneys' fees from them. The rule in Washington is that attorneys'

18   fees "may be recovered only when authorized by a private agreement of the parties, a

19   statute, or a recognized ground of equity." *Penn. Life Ins. Co. v. Empl. Sec. Dep't*, 645

20   P.2d 693, 694 (Wash. 1982). Plaintiffs contend that the attorneys' fees provisions in their

21   leases entitle them to fees from UFA and Sportsman pursuant to RCW 4.84.330. (Plf.

22   Resp. to Sport at 22.)

1    First, RCW 4.84.330 provides that, "[i]n any action on a contract or lease . . .

2    where such contract . . . specifically provides that attorneys' fees and costs, which are

3    incurred to enforce the provisions of such contract or lease, shall be awarded to one of the

4    parties, the prevailing party, whether he or she is the party specified in the contract or

5    lease or not, shall be entitled to reasonable attorneys' fees . . . ."  RCW 4.84.330.  An

6    action is "on a contract" for purposes of this statute if "the action arose out of the contract

7    and if the contract is central to the dispute."  *Seattle First Nat. Bank v. Washington Ins.*

8    *Guar. Ass'n*, 804 P.2d 1263, 1270 (Wash. 1991).  "If a party alleges breach of a duty

9    imposed by an external source, such as a statute or the common law, the party does not

10   bring an action on the contract, even if the duty would not exist in the absence of a

11   contractual relationship."  *Boguch v. Landover Corp.*, 224 P.3d 795, 805 (Wash. Ct. App.

12   2009) (citing *Hemenway v. Miller*, 807 P.2d 863, 873 (Wash. 1991).)  When an

13   underlying contract "merely provide[s] the background" for a claim, "it is apparent that

14   the action is not 'on the contract.'"  *Hemenway*, 807 P.2d at 873.

15   Here, both the Lacey and Burlington leases provide for attorneys' fees in the event

16   of a dispute regarding the contract.  (*See* Burlington Lease ¶ 39; Lacey Lease ¶ 38.)  As

17   such, the relevant question is whether any of Plaintiffs' remaining claims against

18   Sportsmans and UFA are "on the contract."[12]

19   _____

20   [12] The court notes that neither Sportsman nor UFA are parties to the leases in question.
     Washington law is unclear as to whether the remedy of RCW 4.84.330 is available against non-parties.

21   On one hand, the Washington Supreme Court has made clear that "RCW 4.84.330 is not a fee-shifting
     statute."  *Wachovia SBA Lending, Inc. v. Kraft*, 200 P.3d 683, 686-87 (Wash. 2009).  Rather, "the purpose
     of RCW 4.84.330 is to make unilateral contract provisions bilateral."  *Id.*  That is, "[t]he statute ensures

22   that no party will be deterred from bringing an action on a contract or lease for fear of triggering a one-

1        Plaintiffs' only remaining claim against Sportsman is a fraudulent transfer claim.

2    The elements of this claim do not depend on a specific provision of Plaintiffs' leases, and

3    liability can be decided without reference to the terms of the leases.  Moreover,

4    Sportsman's alleged duty is imposed by an external statute (the Uniform Fraudulent

5    Transfer Act), rather than by the leases.  At most, the contract forms the background for

6    the claim, as it establishes that Plaintiffs were "creditors" of Wholesale under the

7    Uniform Fraudulent Transfer Act.  *See* RCW 19.40.011.  However, the mere fact that a

8    contract provides the background for a claim is insufficient to create liability for

9    attorneys' fees under RCW 4.84.330.  *See Hemenway*, 807 P.2d at 873.  Because the

10   leases are not central to Plaintiffs' dispute with Sportsman, Plaintiffs are not entitled to

11   attorneys' fees from Sportsman.  *See Seattle First Nat. Bank*, 804 P.2d at 1270.

12       Plaintiffs' only remaining claims against UFA are a fraudulent transfer claim and a

13   tortious interference with contract claim.  For the reasons discussed in the preceding

14   paragraph, Plaintiffs are not entitled to attorneys' fees from UFA on the basis of the

15   fraudulent transfer claim.  Washington courts are split as to whether tortious interference

16   claims are "on the contract."  *Compare Tradewell Grp., Inc. v. Mavis*, 857 P.2d 1053,

17   1058 (Wash. Ct. App. 1993) (finding that a tortious interference claim was not "on the

18

19   sided fee provision."  *Id.*  A suit against a non-party does not implicate that concern.  Moreover,
     Washington courts have held that a "contractual attorney fee provision cannot authorize the recovery of
20   fees from  nonparty."  *Watkins v. Restorative Care Center, Inc.,* 831 P.2d 1085 (Wash. Ct. App. 1992);
     *Braut v. Tarabochia*, 17 P.3d 1248, 1251 (Wash. Ct. App. 2001).  On the other hand, Plaintiffs have cited
     one case where a Washington Appellate Court applied RCW 4.84.330 against a non-party.  *See Deep*
21   *Water Brewing, LLC v. Fairway Res. Ltd.*, 215 P.3d 990, 1016 (Wash. Ct. App. 2009).  The court declines
     to decide this question of Washington State law because it finds that, even if RCW 4.84.330 is
22   enforceable against non-parties, Plaintiffs' claims against UFA and Sportsman are not "on the contract"
     within the meaning of the statute.

contract") *with Deep Water Brewing*, 215 P.3d at 1016 (finding that a tortious interference claim was "on the contract"). Specifically, the court *Deep Water Brewing* held that a tortious interference claim was "on the contract" when the claim was in effect an effort to enforce the underlying easement and right of way agreements as a third-party beneficiary. *See* 215 P.3d at 1016. On the hand, the court in *McCord v. CMDG Investments* held that a tortious interference claim was not "on the contract" where the terms of the underlying agreement were "neither material nor central to" any of the elements of the claim and "did not define or prove" the tortious interference claim. *McCord v. CMDG Investments, LLC*, 177 Wash. App. 1027, at \*10 (2013).[13]

The court finds that this case is more analogous to *McCord* than to *Deep Water Brewing*. To be successful on their claim of tortious interference, Plaintiffs must show that (1) the leases were valid, (2) UFA knew of the leases, (3) UFA's sale of Wholesale's assets and transfer of stock to Alamo intentionally interfered with the leases, (4) UFA's actons were improper, and (5) Plaintiffs suffered damage. *See Leingang.*, 930 P.2d at 300. The terms of the leases are "neither material nor central" to any of these elements, nor will the terms of the leases "define or prove" Plaintiffs' claims. *See McCord*, 177 Wash. App. 1027, at \*10. At best, the leases are background to the claims. As such, Plaintiffs are not entitled to attorneys' fees from UFA. *See Hemenway*, 807 P.2d at 873

//

---

[13] Federal courts "may consider unpublished state decisions, even though such opinions have no precedential value." *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 (9th Cir. 2003).

1    Plaintiffs briefly argue that UFA and Sportsman are equitably estopped from

2    arguing that Plaintiffs' claims are not "on the contract" because UFA and Sportsman

3    relied on Paragraph 22.2 of the Burlington Lease to argue that Burlington's consequential

4    damages were limited.  The elements of equitable estoppel are:  "(1) an admission,

5    statement, or act inconsistent with a claim afterward asserted, (2) action by another in

6    reasonable reliance upon that act, statement or admission, and (3) injury which would

7    result to the relying party if the first party were allowed to contradict or repudiate the

8    prior act, statement or admission."  *Colonial Imports, Inc. v. Carlton Nw., Inc.*, 853 P.2d

9    913, 918 (Wash. 1993).  Generally, "equitable estoppel is not favored, and the party

10   asserting estoppel must prove each of its elements by clear, cogent, and convincing

11   evidence."  *Id.*

12   Plaintiffs have not shown that UFA's and Sportsman's positions are inconsistent.

13   The mere contention that Burlington's lease limits its damages for breach does not render

14   the lease "central" to Plaintiffs' substantive claims for tortious interference and

15   fraudulent transfer.  *See Seattle First Nat. Bank*, 804 P.2d at 1270.  Section 22.2 has no

16   bearing on UFA or Sportsman's liability for those claims, but rather will only become

17   relevant after a decision on liability favorable to Plaintiffs, if any, is rendered.  As such,

18   UFA and Sportsman are not equitably stopped from arguing that the claims against them

19   do not arise under the leases.  For this reason, also, Plaintiffs are not entitled to attorneys'

20   fees from UFA or Sportsman.

21   //

22   //

ORDER- 43

1    **H.      Motion to Extend Trial Length**

2          As a final matter, the court turns to UFA's unopposed motion to extend the trial

3    length (Mot. to Extend).  UFA requests that the court double the trial length from four to

4    eight days on the basis that the parties did not fully grasp the complexity of the case when

5    they originally proposed a trial length of five days.  (*See id.*; *see also* Stip. (Dkt. 70.))

6    The Federal Rules of Civil Procedure provide that a schedule may be modified only for

7    good cause and with the judge's consent.  Fed. R. Civ. P. 16(b)(4).  Because this order on

8    the parties' motions for summary judgment substantially narrows the issues for trial, the

9    court finds that UFA has not shown good cause to lengthen the trial.  Therefore, the court

10   DENIES UFA's motion to extend the trial length.

11                            **IV.      CONCLUSION**

12         For the foregoing reasons, the court GRANTS in part and DENIES in part UFA's

13   motion for partial summary judgment (Dkt. # 119).  The court also GRANTS in part and

14   DENIES in part Sportsman's motion for summary judgment (Dkt. # 117).  The court

15   GRANTS Plaintiffs' motion for partial summary judgment (Dkt. # 101).  The court

16   STRIKES Alamo, Wholesale, and Mr. Gaube's motion to join (Dkt. # 125).  The court

17   DENIES UFA's motion to extend the trial length (Dkt. # 121).  Finally, the court

18   DIRECTS the clerk to SEAL the exhibit filed at docket number 118-8, and DIRECTS

19   Sportsman to file a redacted version of this exhibit that comports with Local Rule 5.2.

20   *See* Local Rules W.D. Wash. LCR 5.2.

21         At this point, the claims remaining for trial are:  Plaintiffs' breach of contract and

22   misrepresentation claims against Wholesale; Plaintiffs' tortious interference with contract

1   claims against Alamo, Mr. Gaube, and UFA; and Plaintiffs' fraudulent transfer claims

2   against all defendants.  (*See* Am. Compl. ¶¶ 26-33.)

3        Dated this 28th day of January, 2015.

4

5

6        _____

7        JAMES L. ROBART
         United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 45