

1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON
                            AT SEATTLE

9

10   LACEY MARKETPLACE                    CASE NO. C13-0383JLR
     ASSOCIATES II, LLC,

11                                        ORDER
                        Plaintiff,

12

13                v.

     UNITED FARMERS OF ALBERTA
14   COOPERATIVE LTD, et al.,

15                      Defendants.

16   BURLINGTON RETAIL, LLC,             CASE NO. C13-0384JLR

17                      Plaintiff,

18                v.

19   UNITED FARMERS OF ALBERTA
     COOPERATIVE LTD, et al.,

20
                        Defendants.

21

22   //

ORDER- 1

# I.   INTRODUCTION

Before the court are Defendant United Farmers of Alberta Cooperative Limited ("UFA") renewed motion for judgment as a matter of law and motion for a new trial. (Mot. (Dkt. # 220).)  The court has considered the motions, all submissions filed in support of and opposition to the motions, the balance of the record, and the applicable law.  Being fully advised,[1] the court DENIES UFA's renewed motion for judgment as a matter of law and motion for a new trial.

# II.   BACKGROUND

The court conducted a jury trial in this matter from March 2 to March 6, 2015, on Plaintiffs Lacey Marketplace Associates II, LLC's ("Lacey") and Burlington Retail, LLC's ("Burlington") breach of contract claims against Defendant Wholesale Sports USA, Inc. ("Wholesale Sports"), tortious interference with contract claims against Defendants United Farmers of Alberta Co-Op Limited ("UFA"), Alamo Group, LLC ("Alamo"), and Donald Gaube ("Mr. Gaube"), and fraudulent transfer claims against UFA, Alamo, and Mr. Gaube, and defendant Sportsman's Warehouse, Inc. ("Sportsman").  (*See* Dkt. ## 223-227 (trial transcripts); Jury Inst. (Dkt. # 183) No. 15.) The jury returned a verdict in Plaintiffs' favor on all claims.  (Verdict (Dkt. # 187).)  The jury awarded damages as follows:  $5,218,493.35 to Lacey on each claim and $6,668.255.94 to Burlington on each claim.  (*Id.*)

At trial, Plaintiffs argued that Wholesale, a wholly-owned UFA subsidiary that

---

[1] Neither party requested oral argument, and the court deems it unnecessary for the disposition of the motions. *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

operated large retail sporting good stores, breached its leases on Plaintiffs' properties by

failing to make monthly rental payments.  Plaintiffs further argued that the other

Defendants tortiously interfered with Plaintiffs' leases by executing a series of

transactions that left Wholesale without assets and unable to pay the rent.  Plaintiffs'

further argued that these transactions resulted in fraudulent transfers by Wholesale.

Specifically, Plaintiffs argued that the transactions occurred as follows:

Defendants entered into a "Master Transaction Agreement."  Under this agreement,

Wholesale sold all of its assets and inventory, and almost all of its retail store locations,

to Sportsman.  However, Wholesale retained the two stores and leases on Plaintiffs'

property. Sportsman paid $47 million for Wholesale's assets and inventory.  The

purchase price was ultimately transferred to UFA.[2]  UFA then sold Wholesale's stock to

Alamo, Mr. Gaube's company, for $1.00.[3]  At that point, Wholesale held lease

obligations, but essentially no assets.  Shortly thereafter, Wholesale defaulted on its

leases to Plaintiffs.[4]

Plaintiffs contended that they were owed two types of damages:  (1) the missed

rental payments incurred before they obtained replacement tenants, and (2) the

//

---

[2] Under the written terms of the agreement, Sportsman was to pay Wholesale, who would immediately transfer the money to UFA.  At trial, Plaintiffs contended that the money was actually paid directly to UFA.  UFA contended that UFA ultimately applied the purchase price in part to pay off its debts.

[3] There is no documentation that the $1.00 was ever paid.

[4] Various last minute amendments and side agreements between the parties resulted in additional monetary transfers from UFA and Sportsman to Alamo that amounted to approximately $1.8 million.

1    construction, remodeling, and other costs that they necessarily expended to obtain the

2    replacement tenants.

3        At the close of evidence, UFA made a motion pursuant to Federal Rule of Civil

4    Procedure 50(a).  In its motion, UFA argued that it was entitled to judgment as a matter

5    of law on the fraudulent transfer claim because (1) Plaintiffs were not "present creditors"

6    and "there's no evidence in the record to establish that they were as of the date of closing

7    the Master Transaction Agreement." (3/5/15 Tr. Trans. (Dkt. # 226) at 216.)  UFA also

8    argued that it was entitled to judgment as a matter of law on the tortious interference

9    claim because there was a "lack of evidence of an improper purpose or improper

10   means."[5]  (*Id.*)

11       UFA's renewed motion for judgment as a matter of law raises the same two

12   arguments, as well as the argument that, with respect to the tortious interference claim,

13   there is insufficient evidence to show that UFA intentionally interfered with Plaintiffs'

14   contracts.  (*See* Mot. at 3-6.)  UFA's motion for a new trial raises the three arguments

15   mentioned above, in addition to three legal arguments pertaining to damages: (1) the

16   court improperly excluded certain evidence pertaining to damages, (2) the court

17   erroneously prevented Defendants from offsetting future expected rents from the

18   replacement tenants against Plaintiffs' damages, and (3) the court erroneously interpreted

19

20

21       [5] Specifically, counsel for UFA moved in total as follows:  "We move for a directed verdict to dismiss the claim under RCW 19.40.051(a) because the landlords were not a present creditor, and there's no evidence in the record to establish that they were as of the date of closing of the Master Transaction Agreement.  And, also, the tortious interference claim for lack of evidence of an improper purpose or improper means."  (3/5/15 Tr. Trans. at 216.)

22

ORDER- 4

1  Burlington's contract as permitting recovery of consequential damages.  (*See id.* at 7-12.)

2  UFA's motions are now before the court.

3  ### III.    ANALYSIS

4  **A.    Standard for Judgment as a Matter of Law**

5        The court may grant UFA's renewed motion for judgment as a matter of law if it

6  "finds that a reasonable jury would not have a legally sufficient evidentiary basis" to find

7  for Plaintiffs.  *See* Fed. R. Civ. P. 50(a).  The court must view the evidence and draw all

8  reasonable inferences in favor of Plaintiffs—the parties in whose favor the jury returned

9  its verdict.  *Ostad v. Or. Health Sci. Univ.*, 327 F.3d 876, 881 (9th Cir. 2003).  Granting a

10  motion for judgment as a matter of law is proper if "the evidence permits only one

11  reasonable conclusion, and the conclusion is contrary to that reached by the jury."  *Id.*

12  Judgment as a matter of law "is appropriate when the jury could have relied only on

13  speculation to reach its verdict."  *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802-

14  03 (9th Cir. 2009).

15        A renewed motion for judgment as a matter of law under Rule 50(b) is limited to

16  the grounds asserted in the pre-deliberation Rule 50(a) motion.  *EEOC v. GoDaddy*

17  *Software, Inc.*, 581 F.3d 951, 961-62 (9th Cir. 2009).  Thus, a party cannot properly raise

18  arguments in its post-trial motion under Rule 50(b) that it did not raise in its pre-verdict

19  Rule 50(a) motion.  *Id.* (citing *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th

20  Cir. 2003) and other cases).  If a party raises additional grounds for judgment as a matter

21  of law, the court will review those grounds only "for plain error, and [will] reverse only if

22  such plain error would result in a manifest miscarriage of justice."  *Id.* at 961.  "This

ORDER- 5

1   exception permits only extraordinarily deferential review that is limited to whether there

2   was *any* evidence to support the jury's verdict."  *Id.* at 961-62 (alterations in text omitted;

3   italics in original) (citing *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101,

4   1109 (9th Cir. 2001)).

5   **B.    Standard for a Motion for a New Trial**

6          The standard under which the court considers UFA's motion for a new trial is

7   distinct from the standards under which it considers UFA's renewed motion for judgment

8   as a matter of law.  Under Rule 59(a)(1)(A), the "court may, on motion, grant a new trial

9   on all or some of the issues—and to any party . . . after a jury trial, for any reason for

10  which a new trial has heretofore been granted in an action at law in federal court."  Fed.

11  R. Civ. P. 59(a)(1)(A).  "Rule 59 does not specify the grounds on which a motion for new

12  trial may be granted."  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).

13  Rather, the court is "bound by those grounds that have been historically recognized."  *Id.*

14  "Historically recognized grounds include, but are not limited to, claims 'that the verdict is

15  against the weight of the evidence, that the damages are excessive, or that, for other

16  reasons, the trial was not fair to the party moving.'"  *Id.* (citation omitted).

17         Courts apply a lower standard of proof to motions for new trial than they do to

18  motions for judgment as a matter of law.  Thus, even if the court declines to grant

19  judgment as a matter of law, it may order a new trial under Rule 59.  A verdict may be

20  support by substantial evidence, yet still be against the clear weight of evidence.  *Landes*

21  *Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).  Unlike a

22  motion for judgment as a matter of law, in addressing a motion for a new trial, "[t]he

1   judge can weigh the evidence and assess the credibility of witnesses, and need not view

2   the evidence from the perspective most favorable to the prevailing party." *Id.* Instead, if,

3   "having given full respect to the jury's findings, the judge on the entire evidence is left

4   with the definite and firm conviction that a mistake has been committed," then the motion

5   should be granted. *Id.* at 1371-72.

6        However, a motion for new trial should not be granted "simply because the court

7   would have arrived at a different verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir.

8   2002). Indeed, when a motion for a new trial is based on insufficiency of the evidence,

9   "a stringent standard applies" and a "new trial may be granted . . . only if the verdict is

10   against the great weight of the evidence" or "it is quite clear that the jury has reached a

11   seriously erroneous result." *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1347

12   (9th Cir. 1984) (internal quotations and citations omitted). "[D]enial of a motion for a

13   new trial is reversible only if the record contains no evidence in support of the verdict or

14   if the district court 'made a mistake of law." *GoDaddy Software, Inc.*, 581 F.3d at 962.

15   **C.   Tortious Interference with Contract**

16        "A claim for tortious interference with a contractual relationship or business

17   expectancy requires five elements:  (1) the existence of a valid contractual relationship or

18   business expectancy; (2) that defendants had knowledge of that relationship; (3) an

19   intentional interference inducing or causing a breach or termination of the relationship or

20   expectancy; (4) that defendants interfered for an improper purpose or used improper

21   means; and (5) resultant damage." *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 930 P.2d

22   288, 300 (Wash. 1997). Interference for an "improper purpose" means interference with

the intent to harm the plaintiff or for some other improper objective, such as hostility or

retaliation. *See Pleas v. City of Seattle*, 774 P.2d 1158, 1163 (Wash. 1989); *Elcon Const.,*

*Inc. v. E. Wash. Univ.*, 273 P.3d 965, 971 (Wash. Ct. App. 2012).

UFA challenges the sufficiency of the evidence supporting the third and fourth

elements.  (Mot. at 4.)  UFA challenged the fourth element, but not the third, in its Rule

50(a) motion at trial.  (*See* 3/5/15 Tr. Trans. at 216.)  Therefore, on the renewed motion

for judgment as a matter of law under Rule 50(b), the court reviews the jury's finding of

the fourth element for substantial evidence and the jury's finding of the third element for

"plain error [that] would result in a manifest miscarriage of justice."  *See GoDaddy*

*Software, Inc.*, 581 F.3d at 961-62.

At trial, Plaintiffs put forth evidence showing the following.  UFA controlled

Wholesale.[6]  UFA sold off all of Wholesale's assets and pocketed the money for itself.[7]

UFA knew that after the sale, Wholesale had no assets, and consequently was unable to

meet its lease obligations.[8]  UFA transferred Wholesale's stock to Alamo[9] essentially for

---

[6] (3/4/15 Tr. Trans. (Dkt. # 225) at 60:23-61:7, 64:12-17, 106:15-107:24; Tr. Ex. 1 ¶ A;  Tr. Ex. 8 (collectively showing that Wholesale was UFA's wholly-owned subsidiary, the two companies shared board members, and no independent director of Wholesale approved the Master Transaction Agreement).

[7] (MTA ¶ 2.1 (sale of Wholesale assets to Sportsman), ¶ 2.2(a) (transfer of asset purchase price to UFA); Tr. Ex. 5 (UFA schematic showing asset price transferred to UFA); 3/4/15 Tr. Trans. at 68:19-69:6 (UFA used the money from Sportsman pay off its debts), 94:14-18 (same).)

[8] (3/5/15 Tr. Trans. at 79:18-25 (testimony by UFA's chief executive officer ("CEO") admitting that, the day after the transaction, Wholesale "had nothing in it" except for the leases).

[9] (MTA ¶¶ C.2, 2.2(b), (c) (sale of Wholesale stock to Alamo for $1 scheduled to occur after the transfer of the asset purchase price); 3/6/15 Tr. Trans. (Dkt. # 227) at 38:5-7, 39:8-9 (UFA has no documentation that the contractual $1 was paid); Tr. Ex. 76 (stating that Alamo did not intend to pay anything for Wholesale's stock because the stock was "effectively worthless").

1   free.[10]  UFA knew that, if Wholesale did not perform on its lease obligations, the

2   transaction could be considered a "sham."[11]

3       The court finds that, viewed in the light most favorable to Plaintiffs, this evidence

4   is sufficient for a jury to find that UFA's interference with Plaintiffs' leases was

5   intentional and for an improper objective.  UFA's insistence on a smoking gun is

6   misguided.  (*See* Mot. at 7 (arguing that there was no direct evidence that UFA

7   affirmatively desired to harm Plaintiffs).)  Plaintiffs' evidence showed that UFA

8   intentionally orchestrated its transactions to siphon all value out of Wholesale, divest

9   itself from liability for Wholesale's actions, and leave Plaintiffs with a judgment-proof

10  debtor unable to meet its lease obligations.  A jury viewing this situation in the light most

11  favorable to UFA could reasonably infer that UFA intended to interfere with Plaintiffs'

12  leases and did so with an improper objective.  *See Pleas*, 774 P.2d at 1163.

13      UFA's remaining arguments are similarly unavailing.  The fact that the structure

14  of the transactions did not violate Plaintiffs' leases does not save UFA from tort liability.

15  (*See* Mot. at 6.)  A defendant does not have to induce *two* contract violations to be liable

16  for tortious interference.  Additionally, the evidence of Alamo's attempts to locate

17  replacement tenants is not so overwhelming as to demand a finding of lack of intent on

18  the part of UFA.  (*See id.* (alleging but failing to identify any such evidence in the trial

19

20

21      [10] In fact, UFA ultimately paid Alamo approximately $1.2 million to accept Wholesale's stock
and its concomitant liabilities.  (*See* 3/4/15 Tr. Trans. at 76:7-:78:20, 80:1-5 (testimony by UFA's CEO).)

22      [11] (*See* Tr. Ex. 65 (email from UFA's general counsel predicting that the transaction "could be
considered as a sham" if Mr. Gaube did not find replacement tenants); 3/4/15 Tr. Trans. at 90:2-91:12.)

1    record).)  The court concludes that the jury's finding of intent was not plain error, and the

2    jury's finding of improper purpose was supported by substantial evidence.  *See GoDaddy*

3    *Software, Inc.*, 581 F.3d at 961-62.  Therefore, the court denies UFA's motion for

4    judgment as a matter of law on this claim.

5            For similar reasons, the court denies UFA's motion for a new trial.  Even weighing

6    the evidence and judging the credibility of the witnesses, it is not clear that the jury's

7    findings go "against the great weight of the evidence" or give rise to a "seriously

8    erroneous result."  *Digidyne Corp*, 734 F.2d at 1347.  The court is not "left with the

9    definite and firm conviction that a mistake has been committed."  *Landes Const. Co.*, 833

10   F.2d at 1371. Therefore, a new trial on this claim is not warranted.  *See Molski*, 481 F.3d

11   at 729.

12   **D.    Fraudulent Transfer**

13           The jury was instructed on four circumstances in which a transfer by Wholesale

14   could be fraudulent.  (Jury Inst. Nos. 29-33); *see* RCW 19.40.041(a)(1), (2); RCW

15   19.40.051(a).  The jury was also instructed that one circumstance applied only if UFA

16   was a "present creditor" as defined by Washington's fraudulent transfer statute.  (Jury

17   Inst. No. 33); *see* RCW 19.40.051(a).  The verdict form, however, did not differentiate

18   between the definitions of fraudulent transfer applicable to present as opposed to future

19   creditors.  (*See* Verdict.)  Instead, the verdict form asked generally:  "Do you find that

20   [Plaintiff] has proved its fraudulent transfer claim against UFA?"  (*Id.*)

21           UFA contends that there was no evidence to support a finding that Plaintiffs were

22   present creditors at the time the transfer to UFA occurred.  (Mot. at 6.)  UFA reasons that,

1  because the verdict form did not differentiate between the types of fraudulent transfer, "it

2  is impossible to determine whether the jury relied on the present creditor claim to hold

3  UFA liable." (Mot. at 6.)  UFA then concludes that judgment as a matter of law in favor

4  of UFA or a new trial is required.

5       First, judgment as a matter of law is unwarranted.  Even accepting UFA's premise

6  that a jury could not reasonably find that Plaintiffs were present creditors, UFA has not

7  shown—or even attempted to show—that there was insufficient evidence for a jury to

8  find liability under the other three definitions of fraudulent transfer.  As a result, UFA has

9  not demonstrated that it is entitled to judgment in its favor on this claim.  Accordingly,

10 the court denies UFA's renewed motion for judgment as a matter of law.

11      Second, a new trial is also unwarranted.  Under the statute, a present creditor is a

12 "creditor whose claim arose before the transfer was made."  RCW 19.40.051(a).

13 Conversely, a future creditor is a creditor whose claim "arose . . . after the transfer was

14 made."  RCW 19.40.041(a).  A claim "means a right to payment, whether or not the right

15 is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

16 disputed, undisputed, legal, equitable, secured, or unsecured."  RCW 19.40.011.

17      UFA's position is that Plaintiffs had no contingent or un-matured right to payment

18 from UFA at the time of the transfer because Wholesale was current on its rental

19 payments and did not default until a few months later.  (Mot. at 6.)  This position is

20 contrary to the plain language of the statute.  *See* RCW 19.40.011.  It also disregards

21 Wholesale's preexisting contractual obligations:  at the time the transfer was made,

22 Wholesale was already contractually obligated to make a payment to each Plaintiff every

1    month for the remainder of the leases (approximately the next 8 years).  (*See* Tr. Exs. 2

2    (Lacey lease) ¶ 2, 3 (Burlington lease) ¶ 2.)  Moreover, UFA offers no authority in

3    support of its position that "a ten-year lease with five years left to run is not a present

4    obligation."  (*See* 3/6/15 Tr. Trans. (Dkt. # 227) at 7:18-20).)

5         At trial, Plaintiffs offered the Lacey and Burlington leases as exhibits and

6    presented testimony regarding Wholesale's obligations under the leases. (*See* Tr. Exs. 2,

7    3, 27, A-206; 3/3/15 Tr. Trans. (Dkt. # 224) at 15:7-15, 17:5-22, 20:12-20, 24:10-22,

8    59:21-60:11, 70:8-25 (collectively establishing that Wholesale's leases ran for 15 years

9    with monthly payments of $71,582.50 to Lacey and $73,814.00 to Burlington); *see also*

10    3/6/15 Tr. Trans. 56:5-14 (estimating that the total rent obligations through the end of the

11    lease period were "roughly $30 million").)  In accordance with the Washington statute,

12    the court instructed the jury that, "A creditor is a party who has a right to payment from a

13    debtor, whether or not the right to payment is reduced to judgment, contingent, matured,

14    un-matured, disputed, or undisputed."  (Jury Inst. No. 29.)  The court further instructed

15    the jury that the fourth definition of fraudulent transfer applied only if "[t]he creditor's

16    right to payment arose before the transfer was made."  (*Id.* No. 34.)  During closing

17    arguments, UFA presented its position that Plaintiffs were not present creditors.  (3/6/15

18    Tr. Trans. at 168:18-24.)

19         The court concludes that the jury was free to reject UFA's argument and find in

20    favor of Plaintiffs.  In light of the evidence as to Wholesale's preexisting contractual

21    obligations to Plaintiffs, a finding that Wholesale was a present creditor to Plaintiffs does

22    not go "against the great weight of the evidence" or give rise to a "seriously erroneous

1  result." *Digidyne Corp*, 734 F.2d at 1347.  Furthermore, UFA's argument that such a

2  result renders the distinction between present and future creditors null is incorrect; to give

3  just one example, a proper future creditor would be a person who entered into a contract

4  with the debtor after the fraudulent transfer had been made.  In sum, the court is not "left

5  with the definite and firm conviction that a mistake has been committed." *Landes Const.*

6  *Co.*, 833 F.2d at 1371.  Therefore, the court denies UFA's motion for a new trial on the

7  fraudulent transfer claim.  *See Molski*, 481 F.3d at 729.

8  **E.    Legal Damages Issues**

9          In its motion for a new trial, UFA challenges three rulings made by the court

10 before and during trial.  (Mot. at 7-12.)  UFA already had a full opportunity to brief and

11 argue these issues.  (*See* UFA MSJ (Dkt. # 110); Def. Br. (Dkt. # 163); Plf. Br. (Dkt.

12 # 164); 2d Plf. Br. (Dkt. # 175); 2d Def. Br. (Dkt. # 174).)  UFA presents no new

13 authority supporting its positions, but rather rehashes arguments previously raised.

14 Nonetheless, the court reconsiders its rulings.  Upon reconsideration, the court reaches

15 the same conclusions as it previously reached.

16         **1.  UFA's expert evidence regarding market value**

17         Lacey and Burlington contended that certain remodeling expenses they incurred

18 after Wholesale's breach constituted consequential damages because they were necessary

19 to procure replacement tenants ("re-tenanting costs").  The court instructed the jury that

20 measure of contract damages was "losses that were reasonably foreseeable, at the time

21 the contract was made, as a probable result of a breach."  (Jury Inst. No. 19.)  The court

22 further instructed the jury:

1         Where rental premises were specifically designed or improved for
     the exclusive benefit of the breaching tenant and had to be remodeled in
2    order to be marketable to a new tenant, plaintiffs may recover the
     remodeling costs to the extent the costs were reasonably necessary in order
3    to re-let the properties and not capital improvements for the benefit of the
     new tenant.

4
          Factors that may indicate a capital improvement include, among
5    other factors, whether the remodeling substantially increased the value of
     the premises and whether the remodeling included major, permanent
6    structural changes.

7    (Jury Instr. No. 21); *see Family Med. Bldg., Inc. v. State, Dep't of Soc. & Health Servs.*,

8    702 P.2d 459, 464 (Wash. 1985).[12]  UFA does not dispute this statement of the law.

9    Rather, UFA takes issue with the court's exclusion of certain expert testimony regarding

10   Plaintiff's re-tenanting costs.

11        UFA originally took the position that Defendants were entitled to offset against

12   Plaintiffs' damages any increase in market value in Plaintiffs' property that had occurred

13   since Wholesale's breach.  (*See* 1/28/15 Order at 34-39.)  In support of this position, UFA

14   offered two expert reports.  (*See* Offer of Proof (Dkt. # 180) (attaching the disputed

15   expert reports).)  Both experts opined that the market value of Plaintiffs' properties had

16   increased for two reasons:  (1) the replacement tenants were more financially stable than

17   Wholesale had been (which increased the capitalization rate applicable to the market

18   value calculation), and (2) the new leases included higher rental payments.  (*See id.*)  The

19   experts concluded that, as a result of this increase in market value attributable to the

20

21   _____

22     [12] *See also Pioneer Trust & Sav. Bank v. Zonta*, 421 N.E.2d 239, 245 (Ill. Ct. App. 1981) (cited
     by *Family Medical*); *In re Stewart's Props., Inc.*, 41 B.R. 353, 356 (Bankr. D. Haw. 1984) (collecting
     cases); *New Mkt. Acquisitions, Ltd. v. Powerhouse Gym*, 212 F. Supp. 2d 763, 776-77 (S.D. Ohio 2002).

ORDER- 14

1   replacement tenants, Plaintiffs had not suffered any damages due to the breach of

2   contract.  (*See id.*)

3         On summary judgment, the court held that Defendants were not entitled to offset

4   the increased market value against Plaintiffs' damages.  (*See* 1/28/15 Order at 34-39.)

5   The court added that Defendants would not be permitted to offer evidence or argument

6   for the purpose of requesting such an offset.  (*Id.*)  The court made clear, however, that

7   "this ruling does not prevent [Defendants] from introducing evidence showing increases

8   in market value of the property attributable to specific construction projects (as opposed

9   to the new leases or tenants) for the limited purpose of showing whether the resulting

10   claimed construction cost was a capital improvement or a mitigation expense."  (*Id.* at

11   39.)

12         One month before trial, UFA revised the topics of its experts' testimony.  (*See*

13   Pretrial Order (Dkt. # 154) at 6; Pretrial Conf. Trans. (Dkt. # 157) at 19:23-22:16.)  For

14   the first time, UFA contended that its experts would address "increases in market value of

15   the property attributable to specific construction projects."  (*See* Plf. Br.)  Plaintiffs

16   objected to this testimony as beyond the scope of the experts' reports.  (Pretrial Conf.

17   Trans. at 19:23-22:16.)  The court requested additional briefing and heard argument on

18   the matter.  (*See* Def. Br.; Plf. Br.; 2/23/15 Hearing Tr. (Dkt. # 166).)  The court excluded

19   certain testimony by UFA's experts for two reasons.

20         First, the experts' reports simply did not address the issue of whether Plaintiffs'

21   construction projects increased the market value of the property.  (*See* Offer of Proof.)

22   UFA's arguments to the contrary mischaracterize the reports.  Rather, the reports opined

ORDER- 15

only that the market value of the properties increased due to the new tenants and higher

rents.  (*See id.*)  UFA contends that its experts should have been permitted to connect the

dots at trial, and opine that Plaintiffs were able to charge higher rents or attract better

tenants because of the construction projects.  (Reply at 5-6.)  Such testimony, however,

would run afoul of Federal Rule of Civil Procedure 37(c)(1), which provides:

> If a party fails to provide information or identify a witness as required by
> Rule 26(a) or (e), the party is not allowed to use that information or witness
> to supply evidence on a motion, at a hearing, or at a trial, unless the failure
> was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1); *see also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d

1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth to these requirements by

forbidding the use at trial of any information required to be disclosed by Rule 26(a) that

is not properly disclosed.").

Rule 26 requires parties to disclose in a written report "a complete statement of all

opinions the witness will express and the basis and reasons for them."  Fed. R. Evid.

26(a)(2).  Because the experts' reports did not address construction projects as capital

improvements or link the calculated market value increase to capital improvements in any

way, UFA failed to provide information required by Rule 26(a).  UFA put forth no

evidence or argument showing that the failure to disclose a complete statement of its

expert witnesses' opinions was substantially justified or harmless.  *See id.*  Accordingly,

the court excluded the proffered testimony.  (*See* 2/23/15 Hearing Tr.); *see also Hoffman

v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008), *as amended* (Sept.

16, 2008) (upholding district court's exclusion of undisclosed evidence).

1    UFA now complains that the exclusion was inappropriate because its experts were

2    qualified to opine that Plaintiffs' construction projects were capital improvements that

3    increased the market value of the property.  (Reply at 5 n.1.)  That may be.  The experts'

4    qualifications, however, are beside the point.  The problem with the proffered testimony

5    was that the experts' reports did not fairly disclose such testimony beforehand.

6    UFA also contends that the court's ruling rests on a mere technicality.  (Reply at

7    6.)  Rule 32 is not a technicality.  Rather, it is a "self-executing, automatic sanction to

8    provide a strong inducement for disclosure of material."  *See Hoffman*, 541 F.3d at 1179.

9    Permitting the expert testimony to be admitted would have seriously prejudiced Plaintiffs.

10   UFA disclosed the subject matter of the testimony only one month before trial.  As such,

11   Plaintiffs had no opportunity to confront the experts about the testimony.  Worse, they

12   had no indication as to what the specific content of the testimony would be.  At trial, they

13   would have been flying blind.  Therefore, the court declines to reverse its ruling

14   excluding UFA's revised expert testimony

15   Second, UFA failed to identify any other witness qualified to explain the

16   connection between the experts' market value calculations and Plaintiffs' remodeling

17   projects.  (*See* 2/23/15 Hearing Tr.)  The opined market value increase due to

18   replacement leasehold interests, however, was far afield from the issue in question:

19   whether Plaintiffs' remodeling costs constituted capital improvements.  Without a

20   connection between the two topics, the opinion testimony was not helpful to the jury.  *See*

21   Fed. R. Evid. 702 (requiring expert testimony to "help the trier of fact to understand the

22

1  evidence or to determine a fact in issue"). Rather, it was an invitation to impermissible

2  speculation.

3      In light of the fact that Defendants were not entitled to offset the market value

4  increase, testimony had limited relevance to the question of damages. That limited

5  relevance was substantially outweighed by a danger that the testimony would confuse the

6  issues before the jury and mislead the jury as to the appropriate way to calculate

7  damages. *See* Fed. R. Evid. 403. Therefore, the court declines to reverse its exclusion of

8  UFA's experts' original testimony regarding market value.

9      As the court stated in its summary judgment order, UFA was free to identify

10  remodeling projects that it believed were capital improvements and explain that those

11  projects increased the properties' market value. (*See* 1/28/15 Order at 39.) Instead, UFA

12  prepared expert reports based on erroneous understanding of Washington law. By the

13  time the misunderstanding was apprehended, it was too late to salvage the reports. There

14  is no legal error here.

15      **2. Offset of future rents**

16      On summary judgment, the court rejected UFA's argument that Defendants were

17  entitled to offset the market value of the properties against Plaintiffs' past damages. (*See*

18  1/28/15 Order at 34-39.) In a variation on that theme, UFA sought to argue at trial that

19  Defendants were entitled to offset the future rent payments from the replacement tenants

20  against Plaintiffs' past damages. Plaintiffs objected, and the court ordered supplemental

21  briefing on the matter. (*See* 2d Plf. Br.; 2d Def. Br.) In its briefing, UFA contended that

22  the Defendants were entitled to the offset because the leases required Plaintiffs to re-let

1   the properties on the tenant's account.  (*See* 2d Plf. Br. at 1.)  The court ultimately found

2   that Washington law did not permit an offset.  (3/5/15 Trans. at 65:2-6:14.)

3        Under Washington law, a landlord has two options when a tenant stops paying

4   rent:  (1) treat the lease as surrendered and re-let the premises on her own account, or (2)

5   treat the lease as continuing and re-let the premises on the tenant's account.  *See Hargis*

6   *v. Mel-Mad Corp.*, 730 P.2d 76, 79-80 (Wash. Ct. App. 1986).  Under the first option, a

7   landlord can recover damages for lost rent up until the date he or she re-let the premises;

8   under the second option, a landlord can recover damages for the lost rent for the entire

9   term of the lease, but is required to offset the total of whatever future rents he or she will

10  recover from re-letting the property.  *Id.*

11       Plaintiffs requested damages consistent with the first option:  lost rent up until the

12  date they re-let the premises.[13]  (3/6/15 Tr. Trans. at 141:19-142:20 (Plaintiffs' closing

13  argument disavowing damages for future rent and calculating damages for past rent).)

14  The court reviewed Plaintiffs' dealings with Wholesale after the default and concluded

15  that Plaintiffs' evinced an intent to re-let the premises on the landlords' own accounts.

16  (*See* 3/5/15 Trans. at 65:2-6:14; 2d Plf. Br. Exs. 1, 2 ("Burlington Retail, LLC, is electing

17  to proceed with its option, pursuant to Paragraph 22 of the Lease, to 're-enter and take

18  possession of the Premises' and 're-let all or any part of the Premises.'") (quoting the

19  //

20

---

21  [13] Plaintiffs consistently advanced that position throughout the course of the litigation.  (*See, e.g.*,
    9/26/14 Barrick Rep. (Dkt. # 118-21) at 18:8-9 (Plaintiffs' damages expert stating that lost rent was
22  calculated "up to the date the properties will be fully re-leased," which was "anticipated to occur at
    approximately the time of trial").)

1    Burlington lease).)  Therefore, the court concluded that, under the common law,

2    Defendants were not entitled to an offset.  *See Hargis*, 730 P.2d at 79-80.

3           UFA now reiterates its argument that the leases prevented Plaintiffs from re-letting

4    the properties on their own accounts.  (Mot. at 11.)  The plain language of the leases does

5    not support that argument.  In general, the leases provide that, in the event of a default,

6    Plaintiffs could elect to terminate the lease or not; Plaintiffs could choose to re-enter the

7    premises; re-entering the premises did not necessarily terminate the leases; and if

8    Plaintiffs chose to re-enter the premises, they were required to make "commercially

9    reasonable efforts" to re-let the premises.  (*See* Tr. Exs. 2 (Lacey lease) ¶ 22, 3

10   (Burlington lease) ¶ 22.2.)  The leases do not, however, foreclose Plaintiffs from re-

11   leasing on their own accounts, or otherwise limit the type of damages Plaintiffs could

12   seek upon re-letting the premises. (*See* Tr. Exs. 2 (Lacey lease) ¶ 22, 3 (Burlington lease)

13   ¶ 22.2.)  The court further found that, although Paragraph 22 arguably required a landlord

14   that sought damages for future rents to offset the damages with payments from

15   replacement tenants going forward, that provision was inapplicable to the situation in

16   which a landlord did not seek future rents.  (*See* 3/5/15 Trans. at 65:2-6:14.)  Because

17   Plaintiffs did not seek future rents, no offset against past damages was required.

18          UFA now argues that the court should have allowed the jury to determine, based

19   on Plaintiffs' interactions towards Wholesale after the default, whether Plaintiffs truly

20   intended to re-let the properties on their own behalf. (Mot. at 9-10.)  This is the first time

21   UFA has taken that position.  That position, moreover, conflicts with UFA's previous

22   briefing to the court, in which it specifically requested the court to decide the issue of

ORDER- 20

whether Plaintiffs re-leased the properties on their own account. (*See* Plf. Br. at 1

(requesting the court to find that that an offset "is *directed* by Washington common

law.") (emphasis in original).)  Furthermore, when the court decided the issue of an offset

at trial, UFA did not object on the basis that the issue was a jury question.[14]  (*See* 3/5/15

Trans. at 65:2-6:14.)

Nonetheless, UFA now "questions" whether "the Court's refusal to let this issue

reach the jury comported with the Seventh Amendment's mandate that 'the right of a trial

by jury shall be preserved.'"  (Mot. at 11 (quoting U.S. Const. amend. VII).)  UFA

advances no authority in support of its constitutional "question." (*See id*.)  UFA does not

even cite caselaw showing that the availability of an offset is an issue of fact for the jury.

(*See id.*); *see generally Farmer v. Farmer*, 259 P.3d 256, 262 (Wash. 2011) ("[The]

measure of damages is a question of law.")  In fact, UFA's motion devotes a single

sentence to its constitutional musing.  (*See id.*)  The court finds that UFA has not properly

raised this argument as a ground for requesting a new trial.  Therefore, the court declines

to address it.  The court denies UFA's motion for new trial on this basis.

### 3.  Burlington's lease

The court's summary judgment order fully addressed UFA's contention that

Burlington's lease limited the damages it could seek in the event of default.  (*See* 1/28/15

Order at 32-33.)  The court incorporates that analysis in full into this order.  (*See id.* at

32-33 ("UFA and Sportsman's attempt to transform Section 22.2.1 into a liquidated

---

[14] Neither did UFA submit any proposed jury instructions concerning the issue of whether Plaintiffs re-let on their own behalf or on the tenants' behalf.  (*See* Disp. Jury. Inst. (Dkt. # 160).)

1    damages or waiver of damages clause is not supported by the plain language of the clause

2    or by the remainder of the lease.").)  UFA raises no new arguments in support of its

3    position.  Therefore, for the same reasons as articulated in its summary judgment order,

4    the court denies UFA's motion for judgment as a matter of law or a new trial on this

5    basis.

6        **4.  Excessive damages**

7        UFA claims in passing that the jury's damage award was "excessive" (Mot. at 6),

8    but fails to advance any argument or authority supporting that position throughout the

9    remainder of its briefing.  With respect to damages, the court notes that the jury awarded

10   Plaintiffs their maximum requested damages for both the tortious interference and

11   fraudulent transfer claims against UFA.  (*See* Verdict.)  There can be no dispute that

12   Plaintiffs are not entitled to a double recovery.  Accordingly, the court intends to enter

13   judgment in favor of Plaintiffs only once in the amount of their maximum requested

14   damages.

15   **F.    Miscellaneous arguments**

16       Finally, UFA purports to "renew" all of the arguments it made throughout the

17   course of summary judgment, pretrial, and trial proceedings concerning "contested issues

18   of law . . . regarding joint and several liability, the elements of the [Uniform Fraudulent

19   Transfer Act] and tortious interference claims, and the proper principles for calculating

20   damages for breach of a lease."  (Mot. at 13.)  The court will not revisit each and every

21   ruling it made on those topics, especially when UFA has not bothered to specify the

22   unidentified rulings with which it takes issue, let alone advance arguments supporting its

ORDER- 22

1  positions on those rulings.  The court finds that these arguments are not properly raised.

2  Therefore, the court denies UFA's motion for judgment as a matter of law or a new trial

3  on this basis.

4  ### IV.    CONCLUSION

5          For the foregoing reasons, the court DENIES UFA's renewed motion for judgment

6  as a matter of law and motion for a new trial (Dkt. # 220).

7          Dated this 14th day of May, 2015.

8

9

10  _____
   JAMES L. ROBART
11  United States District Judge

12

13

14

15

16

17

18

19

20

21

22

ORDER- 23