1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LACEY MARKETPLACE ASSOCIATES II, LLC, | CASE NO. C13-0383JLR |
| Plaintiff, | ORDER |
| v. | |
| UNITED FARMERS OF ALBERTA COOPERATIVE LTD, et al., | |
| Defendants. | |
| BURLINGTON RETAIL, LLC, | CASE NO. C13-0384JLR |
| Plaintiff, | |
| v. | |
| UNITED FARMERS OF ALBERTA COOPERATIVE LTD, et al., | |
| Defendants. | |

//

ORDER- 1

# I.   INTRODUCTION

Before the court are Defendant Sportsman's Warehouse, Inc.'s ("Sportsman") renewed motion for judgment as a matter of law (JMOL Mot. (Dkt. # 253)) and motion for a new trial (Rule 59 Mot. (Dkt. # 255).)  The court has considered the motions, all submissions filed in support of and opposition thereto, the balance of the record, and the applicable law.  No party has requested oral argument.  Being fully advised, the court GRANTS in part and DENIES in part both motions.

# II.   BACKGROUND

The court conducted a jury trial in this matter from March 2 to March 6, 2015, on Plaintiffs Lacey Marketplace Associates II, LLC's ("Lacey") and Burlington Retail, LLC's ("Burlington") breach of contract claims against Defendant Wholesale Sports USA, Inc. ("Wholesale Sports"); fraudulent transfer claims against Defendants Sportsman, United Farmers of Alberta Co-Op Limited ("UFA"), Alamo Group, LLC ("Alamo"), and Donald Gaube ("Mr. Gaube"); and tortious interference with contract claims against UFA, Alamo, and Mr. Gaube.  (*See* Dkt. ## 223-227 (trial transcripts); Jury Inst. (Dkt. # 183) No. 15.)  The jury returned a verdict in Plaintiffs' favor on all claims.  (Verdict (Dkt. # 187).)

At trial, Plaintiffs argued that Wholesale, a wholly-owned UFA subsidiary that operated large retail sporting goods stores, breached its leases on Plaintiffs' properties by failing to make monthly rental payments.  Plaintiffs presented evidence that Defendants executed a series of transactions that left Wholesale without assets and unable to pay the rent.  Specifically, Plaintiffs showed that the transactions occurred as follows:

ORDER- 2

1   Defendants entered into a "Master Transaction Agreement."  (Tr. Ex. 1 (Dkt. # 254-13)

2   ("MTA").)  Under this agreement, Wholesale sold all of its inventory and furniture,

3   fixtures, and equipment ("FFE"), and almost all of its retail store locations, to Sportsman.

4   However, Wholesale retained the two store locations and leases on Plaintiffs' property.

5   Sportsman paid $47 million for Wholesale's inventory and FFE.  The parties disputed

6   whether the purchase price was initially paid to Wholesale or to UFA.  Regardless, the

7   purchase price was ultimately used to pay off UFA's and Wholesale's debt on a line of

8   credit.  UFA then sold Wholesale's stock to Alamo, Mr. Gaube's company, for $1.00.[1]

9   At that point, Wholesale held lease obligations, but essentially no assets.  Shortly

10  thereafter, Wholesale defaulted on its leases to Plaintiffs.[2]

11          Plaintiffs contended that they were owed two types of damages:  (1) the missed

12  rental payments incurred before they obtained replacement tenants, and (2) the

13  construction, remodeling, and other costs that they necessarily expended to obtain

14  replacement tenants.  The jury awarded Plaintiffs all of their requested damages:

15  $5,218,493.35 to Lacey on each claim and $6,668.255.94 to Burlington on each claim.

16  (Verdict.)

17  //

18  _____

19      [1] The MTA provided for a $1.00 purchase price (MTA ¶ 2.2), but there is no documentation that
    the $1.00 was ever paid (3/6/15 Tr. Trans. (Dkt. # 227) at 40:3-9).

20

21      [2] A last minute amendment resulted in additional monetary transfers from UFA and Sportsman to
    Alamo that amounted to approximately $1.8 million.  (See Tr. Ex. 5, Pierce Decl. (Dkt. # 265) Ex. 8 (Tr.
    Ex. 67) (first amendment to the MTA).)  Specifically, shortly before closing, Sportsman paid Alamo
    approximately $600,000.00 and UFA paid Alamo approximately $1.2 million.  (See Tr. Ex. 67, Tr. Ex. 5;
22  Tr. Ex. 84.)

1    At the close of Plaintiffs' case, Sportsman made a motion pursuant to Federal Rule

2  of Civil Procedure 50(a).  (3/5/15 Trans. (Dkt. # 226) at 822:12-17.)  In support of its

3  motion, Sportsman stated in full:

4       Sportsman's Warehouse moves the court, under [F]ederal [R]ule 50(a)(1),
        for dismissal of the fraudulent transfer/constructive fraud claims against
5       Sportsman's for absence of evidence to establish lack of reasonable and
        equivalent value, an essential element of the plaintiff's claim.
6
   (*Id.*)  At the close of evidence, Sportsman renewed its motion without elaboration.
7
   (3/6/15 Trans. (Dkt. # 227) at 949:12-13 ("Sportsman's would renew its motion, Your
8
   Honor.").)
9
        Sportsman now moves for judgment as a matter of law on the following bases:  (1)
10
   Wholesale's sale of inventory and FFE to Sportsman was not constructively fraudulent
11
   because there was insufficient evidence for the jury to find that Wholesale did not receive
12
   reasonably equivalent value for the assets, *see* RCW 19.40.041(a)(2), 19.40.051; (2)
13
   Wholesale's sale of inventory and FFE to Sportsman was not actually fraudulent because
14
   there was insufficient evidence for the jury to find that Wholesale acted with "actual
15
   intent to hinder, delay, or defraud" Plaintiffs, *see* RCW 19.40.041(a)(1); (3) even if the
16
   sale was actually fraudulent, Sportsman had a complete defense because it was a good
17
   faith purchaser for reasonably equivalent value, *see* RCW 19.40.081(a); (4) Washington's
18
   Uniform Fraudulent Transfer Act ("the WUFTA") is inapplicable to the sale because
19
   Wholesale's inventory did not meet the statutory definition of "assets," *see* RCW
20
   10.40.011; and (5) Sportsman cannot be liable for the monetary transfers Wholesale made
21
   //
22

1  to other Defendants because Sportsman was not a "person for whose benefit the

2  transfer[s] [were] made," *see* RCW 19.40.081(b)(1).  (*See* JMOL Mot.)

3      In the alternative, Sportsman moves for a new trial on the following bases:  (1) the

4  jury's verdict against Sportsman on the fraudulent transfer claim was against the clear

5  weight of the evidence; (2) Plaintiffs' counsels' closing argument that Sportsman was

6  liable for transfers from Wholesale to other Defendants because the Master Transaction

7  Agreement was "for the benefit of everybody who participated in it" misstated the law;

8  (3) the jury instructions were "incomplete" because they did not contain an instruction

9  that "[a] defendant cannot be liable for a transfer that occurred between Wholesale and a

10 different defendant"; (4) the verdict form was "confusing" because it did not "break out

11 each alleged transfer separately"; and (5) the jury's damages awards were excessive.

12 (Rule 59 Mot. at 7, 9, 13, 14.)  Sportsman's motions are now before the court.

13              **III.   ANALYSIS**

14      Sportsman's arguments fall into two overarching categories.  The first category

15 addresses the question of whether Wholesale's sale of inventory to Sportsman was a

16 fraudulent transfer.  The second category addresses the question of whether, if the sale

17 was not fraudulent, Plaintiffs can nonetheless recover against Sportsman for fraudulent

18 transfers that Wholesale made to other defendants.  After setting forth the applicable legal

19 standards, the court addresses Sportsman's arguments in each category in turn.

20 **A.  Standard for Judgment as a Matter of Law**

21      The court may grant a renewed motion for judgment as a matter of law if it "finds

22 that a reasonable jury would not have a legally sufficient evidentiary basis" to find for

1  Plaintiffs.  *See* Fed. R. Civ. P. 50(a).  The court must view the evidence and draw all

2  reasonable inferences in favor of the party for whom the jury returned its verdict.  *Ostad*

3  *v. Or. Health Sci. Univ.*, 327 F.3d 876, 881 (9th Cir. 2003).  Granting a motion for

4  judgment as a matter of law is proper if "the evidence permits only one reasonable

5  conclusion, and the conclusion is contrary to that reached by the jury."  *Id.*  Judgment as a

6  matter of law "is appropriate when the jury could have relied only on speculation to reach

7  its verdict."  *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802-03 (9th Cir. 2009).

8       A renewed motion for judgment as a matter of law under Rule 50(b) is limited to

9  the grounds asserted in the pre-deliberation Rule 50(a) motion.  *EEOC v. GoDaddy*

10  *Software, Inc.*, 581 F.3d 951, 961-62 (9th Cir. 2009).  Thus, a party cannot properly raise

11  arguments in its post-trial motion under Rule 50(b) that it did not raise in its pre-verdict

12  Rule 50(a) motion.  *Id.* (citing *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th

13  Cir. 2003) and other cases).  If a party raises additional grounds for judgment as a matter

14  of law, the court will review those grounds only "for plain error, and [will] reverse only if

15  such plain error would result in a manifest miscarriage of justice."  *Id.* at 961.  "This

16  exception permits only extraordinarily deferential review that is limited to whether there

17  was *any* evidence to support the jury's verdict."  *Id.* at 961-62 (alterations in text omitted;

18  italics in original) (citing *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101,

19  1109 (9th Cir. 2001)).

20  **B.    Standard for Motion for a New Trial**

21       The standard under which the court considers Sportsman's motion for a new trial

22  is distinct from the standards under which it considers Sportsman's renewed motion for

1    judgment as a matter of law.  Under Rule 59(a)(1)(A), the "court may, on motion, grant a

2    new trial on all or some of the issues—and to any party . . . after a jury trial, for any

3    reason for which a new trial has heretofore been granted in an action at law in federal

4    court." Fed. R. Civ. P. 59(a)(1)(A).  "Rule 59 does not specify the grounds on which a

5    motion for new trial may be granted." *Molski v. M.J. Cable, Inc*., 481 F.3d 724, 729 (9th

6    Cir. 2007).  Rather, the court is "bound by those grounds that have been historically

7    recognized." *Id*.  "Historically recognized grounds include, but are not limited to, claims

8    'that the verdict is against the weight of the evidence, that the damages are excessive, or

9    that, for other reasons, the trial was not fair to the party moving.'" *Id*. (citation omitted).

10          Courts apply a lower standard of proof to motions for new trial than they do to

11    motions for judgment as a matter of law.  Thus, even if the court declines to grant

12    judgment as a matter of law, it may order a new trial under Rule 59.  A verdict may be

13    support by substantial evidence, yet still be against the clear weight of evidence. *Landes*

14    *Const. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987).  Unlike with a

15    motion for judgment as a matter of law, in addressing a motion for a new trial, "[t]he

16    judge can weigh the evidence and assess the credibility of witnesses, and need not view

17    the evidence from the perspective most favorable to the prevailing party." *Id*.  Instead, if,

18    "having given full respect to the jury's findings, the judge on the entire evidence is left

19    with the definite and firm conviction that a mistake has been committed," then the motion

20    should be granted. *Id*. at 1371-72.

21          A trial court "enjoys broad discretion with regard to a new trial motion." *United*

22    *States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (citing *Allied Chem. Corp. v.*

1   *Daiflon, Inc.*, 449 U.S. 33, 36 (1980) ("The authority to grant a new trial . . . is confided

2   almost entirely to the exercise of discretion on the part of the trial court.")).  Accordingly,

3   "denial of a motion for a new trial is reversible only if the record contains no evidence in

4   support of the verdict or if the district court 'made a mistake of law.'" *GoDaddy*

5   *Software, Inc.*, 581 F.3d at 962.  However, a motion for new trial should not be granted

6   "simply because the court would have arrived at a different verdict." *Pavao v. Pagay*,

7   307 F.3d 915, 918 (9th Cir. 2002).  Indeed, when a motion for a new trial is based on

8   insufficiency of the evidence, "a stringent standard applies" and a "new trial may be

9   granted . . . only if the verdict is against the great weight of the evidence" or "it is quite

10  clear that the jury has reached a seriously erroneous result." *Digidyne Corp. v. Data Gen.*

11  *Corp.*, 734 F.2d 1336, 1347 (9th Cir. 1984) (internal quotations and citations omitted).

12      If a motion for a new trial is joined with a renewed motion for judgment as a

13  matter of law and the district court grants judgment as a matter of law, the court is also

14  required to conditionally rule on the new trial motion.  Fed. R. Civ. P. 50(c); *Freund*, 347

15  F.3d at 764.  The purpose of the conditional ruling is efficiency:  if the judgment is

16  reversed, the appellate court may review the new trial ruling at the same time. *Freund*,

17  347 F.3d at 764.

18  **C.   Objections to Jury Instructions and Verdict Forms**

19      "[J]ury instructions must fairly and adequately cover the issues presented, must

20  correctly state the law, and must not be misleading." *Servs. Employees Int'l Union v.*

21  *Nat'l Union of Healthcare Workers,* 718 F.3d 1036, 1047 (9th Cir.2013) (quotation

22  omitted).  "A party is entitled to an instruction on its theory of the case only if it is

1   supported by law and has foundation in the evidence." *Id.* "[I]f the error in the jury

2   instruction is harmless, it does not warrant reversal." *Hunter v. Cnty. of Sacramento*, 652

3   F.3d 1225, 1232 (9th Cir. 2011).

4         Under Federal Rule of Civil Procedure 51, "[a] party who objects to an instruction

5   or the failure to give an instruction must do so on the record, stating distinctly the matter

6   objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). "If a party does

7   not properly object to jury instructions before the district court, [a court] may only

8   consider 'a plain error in the instructions that . . . affects substantial rights.'"[3] *Hunter*,

9   652 F.3d at 1230 (quoting Fed. R. Civ. P. 51(d)(2)). "Rule 51 includes objections to the

10  form of the verdict as well as to any instructions about the use by the jury of the form."

11  *Ayuyu v. Tagabuel,* 284 F.3d 1023, 1026 (9th Cir. 2002). To the extent that alleged errors

12  "are not claims about the way the jury answered the form's interrogatories, [but] are

13  allegations that errors were built into the form itself," they are waived if no objection is

14  raised "until after the jury had rendered its verdict and [is] discharged." *Yeti by Molly*,

15  259 F.3d at 1109.

16  **D.    Wholesale's Transfer of Assets to Sportsman**

17        The following sections address Sportsman's arguments regarding Wholesale's sale

18  of inventory and FFE to Sportsman.

19  *//*

20  _____

21       [3] *But see Medtronic, Inc. v. White*, 526 F.3d 487, 495 (9th Cir. 2008) (holding that "a limited
     exception" to Federal Rule of Civil Procedure 51(c) exists "when (1) throughout the trial the party argued
     the disputed matter with the court, (2) it is clear from the record that the court knew the party's grounds
22   for disagreement with the instruction, and (3) the party offered an alternative instruction").

## 1.  Constructive fraudulent transfer

During trial, Sportsman moved for judgment as a matter of law that Wholesale's sale of inventory and FFE to Sportsman was not constructively fraudulent because there was insufficient evidence for the jury to conclude that Wholesale did not receive reasonably equivalent value from Sportsman.  (3/5/15 Trans. at 822:12-17.)  Under Washington's version of the Uniform Fraudulent Transfer Act, there are two types of fraudulent transfer:  actual and constructive.  *See Kreidler v. Cascade Nat'l Ins. Co.*, 321 P.3d 281, 289 (Wash. Ct. App. 2014); RCW 19.40.041(a), .051(a).  As relevant here, there are three ways a transfer is constructively fraudulent.  *See* RCW 19.40.041(a)(2), .051(a); *see also* Jury Instr. Nos. 29-33.  All three ways have one element in common:  the debtor made the transfer "without receiving a reasonably equivalent value in exchange."  *See* RCW 19.40.041(a)(2), .051(a); *see also* Jury Instr. Nos. 29-33.

At trial, the parties did not dispute that Sportsman paid reasonably equivalent value for Wholesale's inventory and FFE.  (*See* 3/6/15 Trans. (Dkt. # 227) at 886:1-15 (Sportsman's chairman of the board, Chris Eastland, explaining that the purchase price equaled the historical value of the inventory plus a premium of $10 million); *see also id.* at 981:8-9 (Plaintiffs' counsel during closing argument stating, "We're not fighting the fact that $47 million is the right number or a fair number.").)  Instead, the pertinent question was whether Wholesale or UFA initially received the purchase price.[4]  (*See id.*

---

[4] It was not disputed how the sales proceeds were ultimately applied.  UFA had access to an asset-backed lending agreement with Roynat, Inc., which was essentially a line of credit secured by UFA's assets.  (3/6/15 Trans. at 853:2-12, 877:24-878:11.)  UFA borrowed money against that line of credit and provided the money as intercompany loans to Wholesale.  (*Id.*)  At the time of the inventory

1  at 978:24-979:6 (Plaintiffs' counsel during closing argument stating, "We don't have any

2  quarrel with the $47 million.  But it's got to be received by the debtor.").)

3        Sportsman presented the following evidence.  First, the Master Transaction

4  Agreement ("MTA") provided that Sportsman was to pay the purchase price to

5  Wholesale and, "immediately following" the payment, Wholesale was to "distribute or

6  pay over" the purchase price to UFA.  (MTA ¶ 2.2(a).)

7        Second, Steve Vuch, UFA's current director of finance and previous director of

8  finance for Wholesale, testified that he been responsible for "the day-to-day accounting

9  functions for Wholesale Sports," including "ensuring . . . that the bank accounts had

10 enough money to cover the checks that are paid."  (3/6/15 Trans. at 851:3-10, 352:3-19.)

11 Mr. Vuch consistently confirmed that the purchase price was initially transferred to a

12 Wholesale bank account:

13        Q:  Mr. Vuch, based on your knowledge as director of finance and your
           view of the documents that we have looked at today, can you tell the jury
14         conclusively where the proceeds from the sale of Wholesale Sports' assets
           went in the initial transfer?

15
          A:  They went to Wholesale Sports U.S.A.
16

17 (*Id.* at 859:14-19.)

18 sale, $25.6 million of the debt was associated with financing the inventory of Wholesale, and $4 million
   of the debt represented another intercompany loan that UFA had made to Wholesale.  (3/4/15 Tr. Trans.
19 (Dkt. # 225) at 478:4-12.)
          After Sportsman paid the money to account -6016, the funds were swept to a designated Roynat
20 account on behalf of UFA.  (3/6/15 Trans. at 874:16-875:2, 876:21-14.)  Accordingly, the proceeds from
   the sale went to pay down UFA's asset-backed lending agreement.  (*Id.* at 874:16-875:2.)  Specifically,
21 $29.6 million of the purchase price was applied to pay off intercompany loans that Wholesale had drawn
   from the line of credit or that UFA had otherwise provided.  (*Id.* at 877:24-878:11; *see also* 3/4/15 Tr.
   Trans. at 479:5-19; 523:17-24.))  The remaining approximately $16 million was applied to pay down
22 UFA's own debt on the line of credit.  (3/6/15 Trans. at 877:24-878:11; *see also* 3/4/15 Tr. Trans. at
   479:5-19, 523:17-24.)

1   Q: Mr. Vuch, plaintiffs contend that Sportsman's Warehouse directly
    transferred $47 million to UFA.  Now, is plaintiffs' contention true?
2
    A: No, it is not.
3
    Q: And how do you know?
4
    A:  I have reviewed the fund flows, and I was able to determine that the
5   funds flow directly to Wholesale Sports, U.S.A.

6   (*Id.* at 851:11-18.)

7        Third, it was undisputed that Sportsman paid the purchase price to an account at

8   U.S. Bank with the account number ********6106.  (*See, e.g.*, 3/6/15 Trans. at 868:11-

9   14; Plf. Resp. to MSJ (Dkt. # 127).)  On March 9, 2013 (one day before the MTA closed),

10  UFA's treasurer sent Mr. Vuch an email attaching "a list of US Bank accounts for WSS

11  USA."  (Tr. Ex. A-240 (Dkt. # 254-5) (email), A-239 (Dkt. # 254-4) (spreadsheet).)  The

12  enclosed spreadsheet lists bank account number -6016 as a "US Bank Account[] for

13  WSS," and states, "All 15 WSS stores deposits are transferred here."  (Tr. Ex. A-239.)

14       Fourth, on multiple occasions, Mr. Vuch confirmed that account number -6016

15  was a Wholesale account at U.S. Bank.

16   Q:  So based on his testimony that you saw versus all the documents that
     we showed you regarding account 6106, do you have any questions as to
17   whether that was a Wholesale Sports or UFA account?

18   A: No, it was a Wholesale Sports U.S.A. account.

19  (3/6/15 Trans. at 873:17-21.)

20   Q:  Now, Mr. Vuch, from your experience and from your review of this
     document, is account 6106 a Wholesale Sports' collector account?
21
     A: Yes, it is.
22

1  (*Id.* at 856:17-24 (referring to Trial Exhibit 244).)

2        Q: . . . This part on the right-hand side, this one box, that's account 6016?

3        A:  Yes.

4        . . .

5        Q:  And that's a Wholesale Sports' account?

6        A:  Yes, it is.

7  (*Id.* at 855:10-15 (referring to Trial Exhibit 239).)

8        Fifth, at trial, UFA's Rule 30(b)(6) deponent and Chief Financial Officer, Mr.

9  Melynchuck testified that the purchase price was transferred to a Wholesale account, not

10  a UFA account.  (3/4/15 Tr. Trans. (Dkt. # 225) at 471:5-12.)

11       On the other side of the issue, Plaintiffs presented only a "funds flow" memo

12  prepared by Sportsman's attorneys to summarize the transactions contemplated by the

13  MTA.  (Pierce Decl. (Dkt. # 265) Ex. 3 (Tr. Ex. 5); 3/6/15 Tr. Trans. at 921:20-922:4.)

14  The memo referred to the -6106 account by the "Account Name" of "United Farmers of

15  Alberta Co-Operative Limited."  (*Id.*)  The memo also scheduled a $1.2 million transfer

16  that UFA had agreed to send to Alamo to be sent from the -6106 account.  (*See* Tr. Ex. 5,

17  Pierce Decl. Ex. 8 (Tr. Ex. 67) (first amendment to the MTA).)

18       In addition, Plaintiffs' counsel raised the following deposition testimony by Mr.

19  Melynchuck:

20       So, from that perspective and where those funds came from, ultimately, the
         ultimate shareholder of that was UFA, and, ultimately, through that
21       disposal and the funds received, obviously Wholesale Sports US, those
         funds through the sale, those funds would come into UFA because you've
22       now divested of it and now ownership has gone to Wholesale—or to the

1   Alamo Group.   So you're not going to—the funds didn't go through
2   Wholesale Sports US.   Those funds went to UFA, because UFA was the
    one that was selling the business.

3   (3/6/15 Trans. at 865:8-17 (Plaintiffs' counsel reading Mr. Melynchuck's deposition to

4   Mr. Vuch.)   Plaintiffs, however, declined to confront Mr. Melynchuk with his previous

5   testimony, opting instead to read it to Mr. Vuch.   (*See id.*)   When Mr. Vuch was asked

6   who could more accurately identify which account belonged to which company, he

7   responded:  "With all due respect to Peter [Melynchuk], it would be myself.  I'm closer to

8   those numbers than he would be as CFO."  (3/6/15 Trans. at 873:12-16.)

9         In light of the scant evidence in Plaintiffs' favor, the court finds that a reasonable

10  jury would not have a legally sufficient evidentiary basis to find that Wholesale did not

11  receive reasonably equivalent value for its inventory sale.   *See* Fed. R. Civ. P. 50(a).

12  Specifically, Sportsman presented unequivocal testimony from a witness with personal

13  knowledge of UFA's and Wholesale's accounts, and contemporaneous UFA documents,

14  identifying the specific account that received Sportsman's funds to be a Wholesale

15  account.   Plaintiffs, however, relied on a memo created by a third party with secondhand

16  knowledge of the accounts, as well as deposition testimony, unrepeated and unaddressed

17  at trial, that did not address the question of ownership of account -6106.

18        That question is amenable to judgment as a matter of law because it is objective

19  and binary:  one of the two companies owned account -6106 and one did not.  The court

20  finds that the "evidence permits of only one reasonable conclusion, and [that] conclusion

21  is contrary to that reached by the jury." *Ostad*, 327 F.3d at 881.  Specifically, even

22  viewing the evidence in the light most favorable to Plaintiffs, the only reasonable

conclusion is that Wholesale received reasonably equivalent value in exchange for its sale of inventory and FFE.  *See Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007) ("The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party.").  Because there was a legally insufficient evidentiary basis for the jury to determine an essential element of the constructive fraudulent transfer claims, judgment as a matter of law is appropriate. *Id.*  Accordingly, the court grants judgment as a matter of law on the constructive fraudulent transfer claims against Sportsman.  *See* Fed. R. Civ. P. 50(b).

For the same reasons, the court finds that the jury's verdict was "against the great weight of the evidence."  *Digidyne Corp.*, 734 F.2d at 1347.  Weighing the evidence, including the UFA list of Wholesale bank accounts and the funds flow memo, and assessing the credibility and relative and relevant personal knowledge of Mr. Vuch and Mr. Melynchuck, the court is "left with the definite and firm conviction that a mistake has been committed."  *Landes Const.*, 833 F.2d at 1371.  There was insufficient evidence for the jury to decide that Wholesale did not receive reasonably equivalent value for its sale of inventory and FFE.  Therefore, the court conditionally grants Sportsman's motion for a new trial on the constructive fraud claims.  *See* Fed. R. Civ. P. 50(c); *Freund*, 347 F.3d at 764.

### 2.  Actual fraudulent transfer

Sportsman moves for judgment as a matter of law that there was insufficient evidence presented at trial to support a finding of actual intent.  As an initial matter, the parties dispute whether Sportsman satisfactorily moved for judgment as a matter of law

1   on the actual fraud claims under Rule 50(a).  At the close of Plaintiffs' case, Sportsman

2   moved for "dismissal of the fraudulent transfer/constructive fraud claims against

3   Sportsman's for absence of evidence to establish lack of reasonable and equivalent value,

4   an essential element of the plaintiff's claim."  (3/5/15 Trans. at 822:12-17.)  Plaintiffs

5   contend that the use of the phrase "fraudulent transfer/ constructive fraud" and the

6   mention of the "element" of "reasonable equivalent value" limited the motion to

7   constructive fraud claims, which are a subset of the fraudulent transfer claims.  (*See*

8   JMOL Resp. (Dkt. # 264) at 3-5.)  For its part, Sportsman points out that "reasonable

9   equivalent value" is a factor relevant to actual fraud, and contends that the phrase

10  "fraudulent transfer/ constructive fraud" should be interpreted to mean "actual fraudulent

11  transfer in addition to constructive fraud."  (JMOL Reply at 2 (Dkt. # 267).)

12      Rule 50(b) "may be satisfied by an ambiguous or inartfully made motion" under

13  Rule 50(a).  *GoDaddy Software, Inc.*, 581 F.3d at 961-62 (quoting *Reeves v. Teuscher*,

14  881 F.2d 1495, 1498 (9th Cir. 1989)).  Absent such a liberal interpretation, "the rule is a

15  harsh one."  *Reeves*, 881 F.2d at 1498 (quoting *Nat'l Indus., Inc. v. Sharon Steel Corp.*,

16  781 F.2d 1545, 1549 (11th Cir.1986)).

17      In contravention of that authority, Plaintiffs parse Sportsman's motion too harshly.

18  Sportsman's motion was consistent with Washington courts' nomenclature:  Washington

19  courts have referred to constructive fraudulent transfer claims as "constructive fraud" and

20  actual fraudulent transfer claims as merely "fraudulent transfers."  *See, e.g.*, *Kreidler*, 321

21  P.3d at 289 (previously cited by both parties).  Accordingly, the court concludes that the

22  better interpretation of Sportsman's motion is that it covered insufficiency of the

ORDER- 16

evidence with respect to both the actual and constructive fraudulent transfer claims.  *See*

*Reeves*, 881 F.2d at 1498.

A transfer is fraudulent if it is made with "actual intent to hinder, delay, or defraud

any creditor of the debtor."  RCW 19.40.041(a)(1).  Washington's Fraudulent Transfer

Act sets forth the following 11 nonexclusive factors that may be considered when

assessing actual intent:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred
 after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had
 been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably
 equivalent to the value of the asset transferred or the amount of the
 obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer
 was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt
 was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor
 who transferred the assets to an insider of the debtor.

//

ORDER- 17

1   RCW 19.40.041(b).  The relevant question is the debtor's—not the transferee's—intent.

2   *Id.*  Actual intent must be proved by "clear and satisfactory" evidence, which is a higher

3   standard than a preponderance of the evidence.[5]  *Clearwater v. Skyline Const. Co.*, 835

4   P.2d 257, 266 (Wash. Ct. App. 1992); *Kreidler*, 321 P.3d at 289.

5          At trial, Plaintiffs presented no evidence showing that the transfer was to an

6   insider (*see* RCW 19.40.011(7) (defining "insider")); that Wholesale retained possession

7   or control of the inventory or FFE after it was transferred; that Wholesale "absconded"

8   after the transfer; that Wholesale concealed assets; or that Wholesale transferred the

9   assets to a lienor who transferred the assets to an insider.  *See* RCW 19.40.041(b)(1), (2),

10  (6), (7), (11).  Additionally, the court has already found that no reasonable jury could

11  have concluded that Wholesale did not receive reasonably equivalent value for its sale of

12  inventory and FFE.  *See supra* § III.D.1; RCW 19.40.041(b)(8).

13         Although Plaintiffs did not receive a copy of the MTA until discovery commenced

14  in September 2013 (3/3/15 Trans. (Dkt. # 224) at 226:16-19), the transaction was not

15  concealed:  it was undisputed that Plaintiffs received notice in February 2013 that

16  Wholesale had entered into an agreement by which Sportsman would acquire

17  Wholesale's assets and continue to operate 10 of Wholesale's stores, while Alamo would

18  acquire Wholesale's stock and remaining four stores.  (*See* 3/3/15 Trans. at 211:21-212:9

19  (one of Plaintiffs' owners, Mack DuBose, explaining that he received a telephone call in

20

21  _____

22      [5] For lack of a definition in Washington case law, the parties agreed that the "clear and
    satisfactory" standard is equivalent to the federal "clear and convincing" standard.  (*See* Jury Instr. No. 4;
    3/6/15 Trans. at 831:16-836:15 (no party excepted to the standard)).

ORDER- 18

February informing Plaintiffs of the transaction), 217:21-218:2; Tr. Ex. 9 (February letter sent to Plaintiffs explaining the transaction); *see also* Compl. (Dkt. # 1) ¶ 3.6); RCW 19.40.041(b)(3).  Similarly, although Plaintiffs filed suit March 4, 2013, seven days before Defendants closed on the MTA, the fact that litigation was pending at the time of the closing does not militate in favor of Plaintiffs.  (*See* Compl.; MTA at 1); RCW 19.40.041(b)(4).  First, Defendants signed the MTA on February 10, 2013, thereby obligating Wholesale to transfer its assets and FFE to Sportsman on March 11, 2013. (*See* MTA at 1.)  Litigation was not pending at that time.  (*See* Compl. (filed March 4, 2013).)  Second, the pending litigation was Plaintiffs' own reaction to the allegedly fraudulent transfer; the litigation had no bearing on Wholesale's initial decision to transfer the assets.

Overall, viewing the evidence in the light most favorable to Plaintiffs, only three of the factors weigh in favor of Plaintiffs.  *See Wallace*, 479 F.3d at 624.  Namely, Wholesale became insolvent shortly after the transfer was made.  (*See* MTA ¶ 2.2(a) (requiring Wholesale to transfer the proceeds to UFA)); RCW 19.40.041(b)(9).  The transfer was of substantially all of Wholesale's assets.  *See* RCW 19.40.041(b)(9); (*but see* 3/4/16 Tr. Trans. at 526:20-527:1 (Mr. Melnychuk testifying that Wholesale sold all of its assets because UFA was looking to exit the sporting goods business in the United

//

//

//

//

1   States).)  And the transfer arguably occurred shortly before or after a substantial debt was

2   incurred.[6]  *See* RCW 19.40.041(b)(10).

3          The court finds that evidence of those three factors alone is not legally sufficient to

4   meet the heightened standard of clear and satisfactory evidence necessary to sustain a

5   finding of actual fraud in this case.  *See Clearwater*, 835 P.2d at 266; *Kreidler*, 321 P.3d

6   at 289; (Jury Inst. No. 4.)  The reason Wholesale became insolvent shortly after the

7   inventory sale is that the purchase price was immediately used to pay down UFA's line of

8   credit.  That fact, however, calls into question the transfer between Wholesale and UFA,

9   not the transfer between Wholesale and Sportsman.  There was no indication that the

10  inventory sale between Wholesale and Sportsman was anything but an arms-length

11  transaction between one retailer seeking to exit the sporting goods business and one

12  seeking to enter it.  (*See* 3/4/16 Tr. Trans. at 526:20-527:1, 594:20-24 (Mr. Gaube

13  testifying, "I think we came away with a very good solution with Sportsman's taking ten

14  of the locations and keeping jobs in place for all the employees, you know, literally no

15  downtime in any of the stores.").)  That is especially true in light of the fact that

16  Wholesale received a reasonably equivalent value for the inventory and FFE it sold.  *See*

17  *supra* § III.D.1.

18         The court concludes that the "evidence permits of only one reasonable conclusion,

19  and [that] conclusion is contrary to that reached by the jury."  *Ostad*, 327 F.3d at 881.

20

21  _____

       [6] Although the transfer occurred years after the lease obligations were incurred, viewing the
22  evidence in the light most favorable to Plaintiffs, a jury could find that the recurring monthly payments
    were "substantial."  *See* RCW 19.40.011(5) (defining "debt").

1   Because there was a legally insufficient evidentiary basis for the jury to determine by the

2   heightened standard of clear and satisfactory evidence that Wholesale acted with actual

3   intent to defraud Plaintiffs when it sold its inventory to Sportsman for $47 million,

4   judgment as a matter of law is appropriate.  *Id.*  Accordingly, the court grants judgment

5   as a matter of law on the fraudulent transfer claim against Sportsman.  *See* Fed. R. Civ. P.

6   50(b).

7          For the same reasons, the court finds that the jury's verdict was "against the great

8   weight of the evidence."  *Digidyne Corp.*, 734 F.2d at 1347.  Weighing the evidence

9   going to each factor, the court is "left with the definite and firm conviction that a mistake

10  has been committed."  *Landes Const.*, 833 F.2d at 1371.  There was insufficient evidence

11  for the jury to find, by clear and satisfactory evidence, that Wholesale sold its inventory

12  and FFE to Sportsman for actual historical cost plus $10 million with "actual intent" to

13  avoid paying rent to Plaintiffs.  *See* RCW 19.40.041(a)(1).  Therefore, the court

14  conditionally grants Sportsman's motion for a new trial on the fraudulent transfer claim.

15  *See* Fed. R. Civ. P. 50(c); *Freund*, 347 F.3d at 764.

16      **3.  Good faith defense**

17          Sportsman also moves for judgment as a matter of law on the basis that the jury

18  was required to find that Sportsman established a good faith defense to the actual

19  fraudulent transfer claim.[7]  (JMOL Mot. at 16-17.)  Sportsman did not raise this ground in

20

21  ─────────────────────

22     [7] Sportsman did not address the good faith defense in its Rule 59 written motion for a new trial.
    (*See* Rule 59 Mot. at 7-9; Rule 59 Reply at 4-5.)  The court will not extend the leniency it showed towards
    Sportsman's oral motions, which were made during the heat of trial, to Sportsman's written motions.

ORDER- 21

1    its original motion for judgment as a matter of law.  (*See* 3/5/15 Tr. Trans. at 822:12-17.)

2    Therefore, the court reviews this ground only for "plain error."  *GoDaddy Software, Inc.*,

3    581 F.3d at 961-62.

4        A transferee of an actual fraudulent transfer may avoid a judgment by showing

5    both that it took the transfer (1) in good faith and (2) for reasonably equivalent value.

6    RCW 19.40.081(a); (*see also* Jury Inst. Nos. 38, 39.)  Good faith is defined as:  "(1) An

7    honest belief in the propriety of the activities in question; (2) no intent to take

8    unconscionable advantage of others; and (3) no intent to, or knowledge of the fact that the

9    activities in question will hinder, delay, or defraud others."  *Sparkman & McLean Co. v.*

10   *Derber*, 481 P.2d 585, 590-91 (Wash. Ct. App. 1971) (quoting *Tacoma Ass'n of Credit*

11   *Men v. Lester*, 433 P.2d 901, 904 (Wash. 1967)).  "[I]f any one of these factors is absent,

12   lack of good faith is established and the conveyance fails."  *Id.*  The burden of

13   establishing this affirmative defense is on the transferee.  *See State v. Coristine*, 300 P.3d

14   400, 404 (Wash. 2013).

15       The court's review of this ground is "extraordinarily deferential" and is "limited to

16   whether there was *any* evidence to support the jury's verdict."  *GoDaddy Software, Inc.*,

17   581 F.3d at 961-62.  The court finds that, at the very least, there was evidence presented

18   supporting the conclusion that Sportsman had knowledge of the fact that the sale of

19   inventory would hinder Plaintiffs' ability to collect rental payments from Wholesale.  *See*

20

21

22   Accordingly, the court concludes that Sportsman did not move for a new trial on the ground of the good faith defense.

1   *Sparkman & McLean Co.*, 481 P.2d at 590-91.  For example, Sportsman, which helped

2   draft the MTA, knew that once Wholesale sold all of its assets, Wholesale intended to

3   immediately turn the purchase price over the UFA.  (*See* MTA ¶ 2.2(a).)  Further, by

4   agreeing at the last minute to pay Alamo an additional $600,000.00 "to assist with its

5   post-closing obligations," including "rent in Burlington or Lacey," Sportsman

6   acknowledged that Wholesale would likely be unable to make the rent payments post-

7   closing.  (*See* Pierce Decl. Ex. 9 (Tr. Ex. 84) (7/16/13 email from Mr. Eastland to Mr.

8   Gaube); *see also* Tr. Ex. 67 (first amendment to the MTA).)  Finally, Sportsman assured

9   Alamo that, with respect to the lease payments, Plaintiffs' "*negotiating leverage will only*

10  *decrease once the deal has closed and the stores go dark*."  (Pierce Decl. Ex. 10 (Tr. Ex.

11  44) (2/25/13 email from Mr. Eastland to Mr. Gaube) (emphasis added).)  Because the

12  foregoing evidence supported a finding that Sportsman failed to meet one of the three

13  prongs of the good faith defense (specifically, knowledge), *see Sparkman & McLean Co.*,

14  481 P.2d at 590-91, judgment as a matter of law is not warranted.  *See GoDaddy*

15  *Software, Inc.*, 581 F.3d at 961-62.  Therefore, the court denies Sportsman's motion for

16  judgment as a matter of law on the good faith defense.

17      **4.  Applicability of the WUFTA**

18      Sportsman moves for judgment as a matter of law that Washington's Uniform

19  Fraudulent Transfer Act does not apply to Wholesale's sale of inventory to Sportsman.

20  (JMOL Mot. at 17.)  This action has been pending for two and a half years, but this is the

21  first time the court has been given any inkling that the WUFTA may not apply.  (*See*

22  *generally* Dkt.)  Sportsman did not raise this issue in its answer, summary judgment

ORDER- 23

1    motion, trial brief, pretrial order, or proposed jury instructions.  (*See* Answer (Dkt. # 82);

2    MSJ (Dkt. # 117); Tr. Br. (Dkt. # 170); Prop. Jury Instr. (Dkt. # 160); Pretrial Order (Dkt.

3    # 187).)  At trial, Sportsman did not elicit testimony on the issue or otherwise argue the

4    issue before the jury.  (*See generally* 3/3/15 Trans.; 3/4/15 Trans. (Dkt. # 225); 3/5/15

5    Trans.; 3/6/15 Trans.)  Rule 50 is not an invitation for a losing party to retry its case on a

6    different theory.  *See* Fed. R. Civ. P. 50.  Accordingly, the court reviews this ground only

7    for a "manifest miscarriage of justice."  *Go-Daddy Software, Inc.*, 581 F.3d at 961-62.

8           The court finds none.  It is true that the WUFTA does not apply to a property

9    transfer to the extent the asset is encumbered by a security interest.  (JMOL Mot. at 17-18

10   (quoting *Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp.*, 959 P.2d 1052, 1060

11   (Wash. 1998)[8]).)  Sportsman contends that Wholesale's inventory and FFE were

12   encumbered because they were security for UFA's asset-backed loan.  (JMOL Mot. at

13   17.)  The loan agreement is a UFA document.  At trial, however, Sportsman elicited no

14   testimony from current or former UFA employees or directors (or other witnesses, for

15   that matter) about the provisions it now cites.  As a result, Sportsman now relies on

16

17   _____

        [8] In *Eagle Pacific*, the Washington Supreme Court held:

18          The UFTA defines "transfer" as any means of disposing of an asset.   RCW
            19.40.011(12).   "Asset" means the property of the debtor, but does not include
19          "[p]roperty to the extent it is encumbered by a valid lien[.]"  RCW 19.40.011(2)(i).  A
            "lien" is defined, in part, as "an interest in property to secure payment of a debt [.]"
20          RCW 19.40.011(8).  Simply put, if a debtor transfers assets unencumbered by security
            interests, that transfer may be analyzed for fraud under RCW 19.40.051(b); but, if the
            debtor transfers assets encumbered by security interests, that transfer is beyond the reach
21          of the statute.

22   *Eagle Pac. Ins. Co.*, 959 P.2d at 1060.

ORDER- 24

1   selected excerpts of the loan in a vacuum of context or explanation.  Those excerpts show

2   only that the loan agreement (1) defined Wholesale as an "Obligor," (2) defined

3   "Inventory" and "Equipment" to include the inventory and equipment and fixtures of all

4   "Obligors," and (3) imposed certain "Inventory Covenants" and "Equipment Covenants"

5   requiring "Obligors" to report on the value of their "Equipment" and "Inventory."  (*See*

6   Dkt. # 254-10 (Tr. Ex. A-140) ¶¶ 8.3, 8.4, 66, 83 (asset-backed loan documents).)

7   Sportsman does not point the court to any provision of the loan agreement defining what

8   constitutes collateral under the loan, let alone a provision defining all of Wholesale's

9   inventory and equipment as collateral.[9]  The court declines to take the interpretive leap

10  Sportsman urges.

11          Moreover, even if Wholesale's inventory was subject to a valid lien under the

12  asset-backed loan, there was no evidence allowing the court or jury to ascertain the extent

13  of that encumbrance.  The WUFTA would apply to any remaining equity in Wholesale's

14  inventory and FFE.  *See, e.g.*, *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F.

15  Supp. 2d 821, 837 (N.D. Iowa 2004) (quoting *Mussetter v. Lyke,* 10 F. Supp. 2d 944,

16  958-59 (N.D. Ill. 1998) ("Uniform case law confirms the self-evident proposition that the

17  unencumbered portion of a debtor's property is an 'asset' for UFTA purposes.")).[10]

18  _____

19          [9] The court notes that the "Collateral Reporting" section is separate and distinct from the
    "Inventory Covenants" and "Equipment Covenants" relied upon by Sportsman.  (*See* Tr. Ex. A-140
20  ¶ 8.1.)

21          [10] Because an "explicit purpose" of the Uniform Fraudulent Transfer Act is uniformity among
    adopting jurisdictions, Washington courts are guided by the interpretations of courts in other jurisdictions
22  applying the Uniform Fraudulent Transfer Act.  *Thompson v. Hanson*, 174 P.3d 120, 126 (2007) (Wash.
    Ct. App. 2009) (looking to First Circuit and Colorado State law to interpret WUFTA terms).

1   Sportsman fails to explain why Wholesale's inventory would be encumbered beyond, at a

2   maximum, the $25.6 million loan that Wholesale drew from the line of credit.  (*Cf.* 3/6/15

3   Tr. Trans. at 878:1-8 (Mr. Vuch testifying that $25.6 million of the purchase price was

4   used to pay down Wholesale's debt on the line of credit and the remaining $20 million

5   "paid down other debt").)

6          In conclusion, Sportsman fails to establish that any, let alone all, of the assets

7   Wholesale transferred were encumbered by a security interest under UFA's asset-backed

8   loan.  There is no manifest miscarriage of injustice here.  *See Go-Daddy Software, Inc.*,

9   581 F.3d at 961-62.  The court denies Sportsman's motion for judgment as a matter of

10  law that the WUFTA does not apply to Wholesale's sale of inventory and FFE.

11         **5.  Damages**

12         Sportsman contends that a new trial is warranted because the jury's damages

13  award on the fraudulent transfer claim was "excessive."[11]  (Rule 59 Mot. at 15.)  "When

14  the court, after viewing the evidence concerning damages in a light most favorable to the

15  prevailing party, determines that the damages award is excessive, it has two alternatives."

16  *Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983).  "It may grant

17  defendant's motion for a new trial or deny the motion conditional upon the prevailing

18  party accepting a remittitur."  *Id.*

19

20

21         [11] The court rejects Plaintiffs' contention that Sportsman "waived" its ability to move for a new
    trial on this ground by not raising the matter during trial.  (Rule 59 Resp. (Dkt. # 263) at 8.)  "Unlike a
22  motion for judgment as a matter of law, a motion for new trial does not have to be preceded by a Rule
    50(a) motion prior to submission of the case to the jury."  *Freund*, 347 F.3d at 765.

ORDER- 26

1    With respect to fraudulent transfer damages, the court instructed the jury: "If your

2 verdict is for a plaintiff on a fraudulent transfer claim, the plaintiff may recover judgment

3 in the amount of either (1) the value of the asset transferred, or (2) the amount necessary

4 to satisfy the creditor's right to payment from the debtor, whichever is less." (Jury Instr.

5 No. 41); *see also* RCW 19.040.081(b), (c), (d); *Thompson v. Hanson*, 239 P.3d 537, 543

6 (Wash. 2009). With respect to consequential contract damages, the court instructed the

7 jury: "Where rental premises were specifically designed or improved for the exclusive

8 benefit of the breaching tenant and had to be remodeled in order to be marketable to a

9 new tenant, plaintiffs may recover the remodeling costs to the extent the costs were

10 reasonably necessary in order to re-let the properties and not capital improvements for the

11 benefit of the new tenant."[12] (Jury Instr. No. 21); *see also Family Med. Bldg., Inc. v.*

12 *State, Dep't of Soc. & Health Servs.*, 702 P.2d 459, 464 (Wash. 1985).

13    The Plaintiffs requested overall damages consisting of approximately $1.6 million

14 and $1.7 million in rent and $3.6 million and $4.9 million in "re-tenanting costs" for

15 Lacey and Burlington, respectively. (3/6/15 Tr. Trans. at 971:1-20, 974:10-14, 1025:15-

16 1026:16.) The jury awarded Plaintiffs their full requested damages on all claims against

17 all Defendants. (*See* Verdict.) Sportsman now takes issue not with the jury's inclusion

18 of consequential damages in the fraudulent transfer award, but rather with the jury's

19

20    [12] The court further instructed the jury: "Factors that may indicate a capital improvement include, among other factors, whether the remodeling substantially increased the value of the premises and

21 whether the remodeling included major, permanent structural changes." (Jury Instr. No. 21); *see also Pioneer Trust & Sav. Bank v. Zonta*, 421 N.E.2d 239, 245 (Ill. Ct. App. 1981) (cited by *Family Medical*, 702 P.2d at 464); *In re Stewart's Props., Inc.*, 41 B.R. 353, 356 (Bankr. D. Haw. 1984) (collecting cases);

22 *New Mkt. Acquisitions, Ltd. v. Powerhouse Gym*, 212 F. Supp. 2d 763, 776-77 (S.D. Ohio 2002).

1  calculation of the value of consequential damages.  (Rule 59 Mot. at 15.)  Specifically,

2  Sportsman now contends the jury improperly found that all of Plaintiffs' requested re-

3  tenanting costs were reasonably necessary to re-let the properties where, in fact, the

4  evidence showed some or all were unrecoverable capital improvements.  (Rule 59 Mot. at

5  15.)

6       The court finds that the jury's award was not against the clear weight of the

7  evidence.  *See Landes Const. Co.*, 833 F.2d at 1371.  Plaintiffs provided itemized lists of

8  the re-tenanting costs incurred, including spreadsheets that summed the costs and

9  supporting invoices.  (*See, e.g.*, Tr. Exs. 217, 219; 3/6/15 Tr. Trans. at 969:8-14 (Lacey's

10 closing argument), 1025:3-1026:16.)  Plaintiffs' witnesses testified that the construction

11 costs were necessary in order to make the premises marketable to replacement tenants.

12 (*See, e.g.*, Tr. Exs. 120, 127 (requirements by new tenants); 3/3/15 Tr. Trans. at 185:20-

13 187:11, 196:17-197:25 (identifying aspects of Wholesale's stores that were undesirable to

14 other tenants, such as archery ranges and black powder storage areas); 3/4/15 Tr. Trans.

15 at 396:1-20, 442:10-17).)

16      Sportsman fails to call the court's attention to any evidence or argument that it put

17 forward at trial showing that Plaintiffs' claimed costs constituted capital improvements.

18 (*See* Rule 59 Mot. at 15-16; *see also* 3/6/15 Tr. Trans. at 1012:5-1024:22 (Sportsman's

19 closing argument, making no mention of damages).)  The court declines to independently

20 //

21 //

22 //

ORDER- 28

1    comb the record tallying the evidence in favor of and against each party.[13]   The fact that

2    a witness testified that some of the re-tenanting costs were improvements required by the

3    new tenants does not, without more, render those costs unrecoverable.  *See Family Med.*

4    *Bldg., Inc.*, 702 P.2d at 464 ("[T]he record indicates that the premises were specifically

5    designed and improved for the exclusive benefit of the State and necessarily had to be

6    remodeled in order that they be marketable to a new tenant.  To the extent these costs

7    were expenses of mitigation and not capital improvements for the benefit of the new

8    tenant, they are recoverable."); (*see also* Rule 59 Mot. at 15 (citing testimony by Mack

9    DuBose).)

10           Sportsman calls out one example of an allegedly unrecoverable capital

11   improvement listed in Plaintiffs' spreadsheets:  the framing, drywall, concrete, and

12   structural steel costs associated with a demising wall.  (Rule 59 Mot. at 16 (citing but not

13   attaching Tr. Exs. 217, 219).)  Sportsman does not explain what the correct damages

14   would be if those costs were excluded.  In fact, neither Sportsman nor other Defendants

15   argued to the jury that the demising costs, as such, should be excluded as a capital

16   improvement.  (*See* 3/6/15 997:21-998:13 (UFA's closing argument), 1012:5-1024:22

17   (Sportsman's closing argument).)  Beyond that, Sportsman's motion for a new trial

18   //

19   _____

20       [13] To the extent other Defendants made arguments or presented evidence regarding the amount of
     damages, Sportsman fails to cite to or otherwise rely on those arguments or evidence in its motion for a
21   new trial.  As such, Sportsman has waived its ability to challenge the jury verdict on the basis of those
     arguments.  *See Yeti by Molly, Ltd.*, 259 F.3d at 1110 (declining to pass on an argument that the appellant
22   "did not even squarely raise . . . in its post-trial motions").

1    provides no explanation as to why the remainder of Plaintiffs' claimed re-tenanting costs

2    constituted unrecoverable capital improvements.

3         Defendants insisted on trying the case on an all or nothing theory.  (*See* 3/6/15

4    997:21-998:13) (UFA's counsel arguing in closing that all of the remodeling costs were

5    unrecoverable).)  But at trial, Defendants fell short of showing that all of Plaintiffs'

6    claimed mitigation costs were unrecoverable capital improvements.  Defendants,

7    however, did not provide the jury with an alternative to Plaintiffs' damages number.

8    They cannot now complain that the jury failed to find the middle ground that they

9    themselves were either unable or unwilling to identify.  The court finds that the jury's

10   verdict was not against the clear weight of the evidence.  Therefore, the court

11   conditionally denies Sportsman's motion for a new trial based on excessive damages.

12   *See* Fed. R. Civ. P. 50(c); *Freund*, 347 F.3d at 764.

13   **E.    Liability for Other Transfers**

14        The following sections address Sportsman's arguments concerning Wholesale's

15   transfers to other Defendants.

16        **1.   "Person for whose benefit the transfer was made"**

17        Sportsman moves for judgment as a matter of law that it is not liable for the

18   fraudulent transfers that Wholesale made to other Defendants.  (JMOL Mot. at 6.)

19   Specifically, Sportsman contends that there was a legally insufficient evidentiary basis

20   for the jury to find that it was "the person for whose benefit [those transfers were] made."

21   (*Id.*; *see also* Jury Instr. No. 37.)  Plaintiffs contend that Sportsman did not move on this

22   ground during trial.  (JMOL Resp. at 4.)  The court disagrees.

During closing argument, Plaintiffs' counsel argued that every Defendant was liable for fraudulent transfer because every Defendant benefitted from the MTA in some way or another.  (3/6/15 Tr. Trans. at 981:19-982:4; *see also* 3/6/15 Tr. Trans. at 1000:18-19, 1028:6-1029:24.)[14]  Sportsman's attorney requested a sidebar with the court and opposing counsel.  (3/6/15 Tr. Trans. at 999:9-1001:18.)  At the sidebar, Sportsman's attorney expressed his belief that Plaintiffs' counsel's argument misstated the law, argued that Sportsman did not meet the legal definition of a "person for whose benefit the transfer was made," and requested that, "rather than retry this case," the court instruct the jury that Sportsman could not be held liable for transfers Wholesale made to other Defendants.  (*Id.*)  The court heard argument from all parties, and ultimately declined to give the instruction, directing Sportsman's counsel to proceed with his closing argument and concluding, "And if I need to, in effect, direct a verdict, I will."  (*Id.* at 1001:15-18.)

The court finds that Sportsman's motion for relief, though "inartful," satisfied Rule 50(b)'s requirement.  *See GoDaddy Software, Inc.*, 581 F.3d at 961-62.  Although Sportsman's motion, in response to an unexpected closing argument, was necessarily

---

[14] Specifically, Lacey's counsel argued:

The transferee of the $16 million was UFA in Canada. That's who got it. But the transaction was for the benefit of everybody who participated in it. They all helped write it. They all signed it. They all wanted it to go through. And we have sued them all as a result of this behavior. It was for the benefit of all of them.

(3/6/15 Tr. Trans. at 981:19-982:4.)  Later, Burlington's counsel argued:

Look at this Master Transaction Agreement, drafted . . . very effectively, very carefully . . . . You don't think they got a benefit out of this? Of course Sportsman's got a benefit.

(3/6/15 Tr. Trans. at 1028:18-22.)

1 extemporaneous, it managed to fulfill the purposes of a Rule 50(a) motion:  it alerted the

2 court to the legal and factual bases for the asserted grounds for relief, requested a

3 judgment from the court that Sportsman was not liable as a beneficiary of transfers to

4 other Defendants, and provided Plaintiffs' counsel an opportunity to adjust their trial

5 strategy accordingly.  *See Reeves*, 881 F.2d at 1498 (noting that Rule 50(a) may be

6 satisfied by, among other things, "an objection to an instruction for insufficient evidence

7 to submit an issue to the jury"); Fed. R. Civ. P. 50(a) (requiring a party moving for

8 judgment as a matter of law to "specify the judgment sought and the law and the facts on

9 which the moving party is entitled to judgment").  The court understood Sportsman to be

10 moving for judgment as a matter of law at trial, and evaluates Sportsman's renewed

11 motion accordingly.

12        Where a debtor has made a fraudulent transfer, a creditor may recover judgment

13 against the first transferee of the asset or the person for whose benefit the transfer was

14 made.  RCW 19.40.081(a), (b); (Jury Instr. No. 37.)  Assuming, as the court found above,

15 that no reasonable jury could find Wholesale did not receive reasonable equivalent value

16 for its inventory sale, the remaining transfers by Wholesale at issue are (1) the $16

17 million[15] applied to pay off UFA's debt under the asset-backed loan and (2) the $1.2

18 million[16] transfer to Alamo.[17]  Sportsman is not the first transferee of either of those

19

_____

20        [15] *See supra* n.4; *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1145-46 (9th Cir. 2013) ("[T]o
the extent a transfer constitutes repayment of the debtor's antecedent or present debt, the transfer is not
21 constructively fraudulent.").

22        [16] The evidence presented at trial regarding whether UFA or Wholesale supplied the $1.2 million
to Alamo was not definitive.  However, the viability of the jury's finding that Alamo was liable for

1  transfers.  Therefore, Plaintiffs could only recover judgment against Sportsman to the

2  extent Sportsman was "the person for whose benefit [one of] the transfer[s] was made."

3  RCW 19.40.081(b).

4        Contrary to Plaintiffs' contention, the fact that an entity received *any* kind of

5  "benefit," no matter how intangible or indirect, from a fraudulent transaction does not

6  subject it to liability.  The paradigm "person for whose benefit a transfer was made" is "a

7  guarantor or debtor—someone who receives the benefit but not the money."  *In re*

8  *Railworks Corp.*, 760 F.3d 398, 403 (4th Cir. 2014); *Bonded Fin. Servs., Inc. v. European*

9  *Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988).[18]  The paradigm is not necessarily

10  exclusive.  *See In re Meredith*, 527 F.3d 372, 375-76 (4th Cir. 2008).  Rather, a court's

11  purpose "is to look through the form of the transaction and determine which entity

12  actually benefitted from the transfer."  *In re Compton Corp.*, 831 F.2d 586, 595 (5th

13  Cir.1987).  Accordingly, the Ninth Circuit found that the "sole shareholder, director, and

14  officer" of a first transferee corporation was the entity for whose benefit the transfer was

15  made because the shareholder "directed the use of the funds received."  *See In re Slatkin*,

16

---

17  fraudulent transfer is not at issue here.  For purposes of this motion, the court views the evidence in the
light most favorable to Plaintiffs, and treats the $1.2 million as if it were supplied by Wholesale.

18

19  [17] Plaintiffs argue that transfers made by parties other than Wholesale were fraudulent.  (*See*
JMOL Resp. at 13.)  Plaintiffs are wrong.  A fraudulent transfer can be found only in the situation of a
transfer of assets by a debtor.  *See* RCW 19.40.011(5), (6), 19.40.041, 19.40.051.  Here, Wholesale was
the only debtor.  Therefore, only Wholesale's transfers are relevant to the fraudulent transfer claim.

20

21  [18] The WUFTA provision providing for judgment against a first transferee or the person for
whose benefit a fraudulent transfer was made "is derived from § 550(a) of the Bankruptcy Code."  Unif.
Fraud. Trans. Act § 8 (comment (2)); *see also* RCW 19.40.081.  Accordingly, Washington courts have
found decisions under the Bankruptcy Code to be instructive when interpreting that provision.  *See*

22  *Kreidler v. Cascade Nat'l Ins. Co.*, 321 P.3d 281, 288 (Wash. Ct. App. 2014).

1    243 F. App'x 255, 257-58 (9th Cir. 2007); *see also Boyer v. Belavilas*, 474 F.3d 375, 377

2    (7th Cir. 2007) (finding that the wife of a debtor was "the entity for whose benefit" a

3    transfer was made because she diverted the transferred funds from the custodial accounts

4    for her children to a corporation she owned and controlled).

5         There are, however, limits on the type of benefit that will subject a third party to

6    liability for a debtor's fraudulent transfer.  Specifically, the benefit received must be

7    "direct, ascertainable and quantifiable" and must bear a "necessary correspondence to the

8    value of the property transferred." *In re Int'l Mgmt. Assoc.*, 399 F.3d 1288, 1293 (11th

9    Cir. 2005) (quoting *Mack v. Newton*, 737 F.2d 1343, 1359-60 (5th Cir. 1984)); *see also In*

10   *re Brooke Corp.*, 488 B.R. 459, 469-70 (Bankr. D. Kan. 2013) (holding that "transfer

11   beneficiary status depends on three aspects of the 'benefit':  (1) it must actually have

12   been received by the beneficiary; (2) it must be quantifiable; and (3) it must be accessible

13   to the beneficiary," and that "the benefit actually received must flow from the initial

14   transfer which is avoided," rather than being "a secondary result" of the transfer) (citing

15   *Bonded Fin. Servs., Inc.*, 838 F.2d at 896).  Consequently, the fact that a fraudulent

16   transfer "provid[es] the unquantifiable key to a larger transaction" in which a third party

17   participates does not necessarily render that third party a person "for whom the transfer

18   was made." *In re Int'l Mgmt. Assoc.*, 399 F.3d at 1290-95 (finding that although the

19   "overarching purpose" of a fraudulent stock repurchase was to further the procurement of

20   a loan integral to the controlling shareholder's restructuring plan, and the controlling

21   shareholder therefore "benefitted' in a larger sense when he . . . fulfilled a necessary

22   //

1  condition of obtaining the funds," that "sort of unquantifiable advantage is not the sort of

2  'benefit' contemplated by the [fraudulent transfer provisions]").

3        Here, Plaintiffs contend that Sportsman is liable for Wholesale's transfers to other

4  Defendants because "without those transfers, the MTA transactions never would have

5  closed." (Rule 59 Resp. at 9; *see also id.* at 6 ("Sportsman's benefitted since the overall

6  MTA transactions would not have occurred without the transfer[s]."").)  The court finds

7  that there was a legally insufficient evidentiary basis for a jury to conclude that

8  Sportsman received a "benefit" cognizable under the WUFTA.  *See* Fed. R. Civ. P. 50(b).

9  Any "benefit" Sportsman may have received from Wholesale's $16 million transfer to

10  UFA (or $1.2 million transfer to Alamo) was not only indirect, but also unquantifiable,

11  and bore no discernible "correspondence to the value of the property transferred."  *See In*

12  *re Int'l Mgmt. Assoc.*, 399 F.3d at 1293; *Mack*, 737 F.2d at 1359-60.  Rather, the benefit

13  was a "secondary result" of the transfers:  Sportsman benefitted from the fact that the

14  transfers occurred, not from the money that was transferred.  *See In re Brooke Corp.*, 488

15  B.R. at 469-70.  Finally, contrary to Plaintiffs' assertion, the mere fact that Wholesale's

16  transfers provided the "key to a larger transaction" in which Sportsman participated is

17  insufficient render Sportsman a "person for whom the transfer[s] [were] made."  *In re*

18  *Int'l Mgmt. Assoc.*, 399 F.3d at 1290-95.  Because "the evidence permits only one

19  reasonable conclusion, and the conclusion is contrary to that reached by the jury," *Ostad*,

20  327 F.3d at 881, judgment as a matter of law is appropriate.  The court therefore grants

21  Sportsman's motion for judgment as a matter of law that Sportsman is not liable for

22  fraudulent transfers that occurred between Wholesale and the other Defendants.

ORDER- 35

1    In the alternative, Sportsman moves for new trial on the basis that Plaintiffs'

2    counsel misstated the law during closing argument.  (Rule 59 Mot. at 9-10.)  Improper

3    closing arguments can be a basis for new trial.  *See, e.g.*, *Anheuser-Busch, Inc. v. Natural*

4    *Beverage Distributors*, 69 F.3d 337, 347 (9th Cir. 1995).  Sportsman properly and timely

5    objected to Plaintiffs' closing arguments.  *See Hemmings v. Tidyman's Inc.*, 285 F.3d

6    1174, 1193 (9th Cir. 2002).  The court, however, is not convinced that Plaintiffs'

7    counsels' statements rose to the level of impropriety that justifies granting a new trial.

8    *See United States v. Berry*, 683 F.3d 1015, 1024 (9th Cir. 2012) ("The trial judge has

9    broad discretion in controlling closing argument, and improprieties in counsel's

10   arguments to the jury do not constitute reversible error unless they are so gross as

11   probably to prejudice the defendant, and the prejudice has not been neutralized by the

12   trial judge.").  The definition of a "person for whose benefit a transfer was made" is not

13   limited to the categories of a guarantor or debtor.  *In re Meredith*, 527 F.3d at 375-76.

14   Consequently, Plaintiffs' counsel was free to argue that the benefits Sportsman received

15   from the transfers were otherwise cognizable under the WUFTA.  In doing so, Plaintiffs'

16   counsel did not contradict any definition of "benefit" previously set forth by the court.

17   *See, e.g.*, *Christopher v. Florida*, 449 F.3d 1360, 1367 (11th Cir. 2006) (upholding grant

18   of a new trial because counsel contravened the court's preexisting summary judgment

19   order during closing argument).  It is not misconduct merely to argue in favor of a verdict

20   that the court later finds is not supported by a sufficient evidentiary basis.  Therefore, the

21   court conditionally denies Sportsman's motion for a new trial based on Plaintiffs'

22   counsel's closing argument.  *See* Fed. R. Civ. P. 50(c); *Freund*, 347 F.3d at 764.

1    A district court, however, "is not limited to the grounds a party asserts to justify a

2  new trial, but may sua sponte raise its own concerns about the . . . verdict." *Experience*

3  *Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014) (citing

4  Fed. R. Civ. P. 59(d)).  "Ultimately, the district court can grant a new trial under Rule 59

5  on any ground necessary to prevent a miscarriage of justice." *Id.* (citing *Murphy v. City*

6  *of Long Beach*, 914 F.2d 183, 187 (9th Cir.1990)).  The court finds that the jury

7  instructions should have included an instruction on the meaning of the phrase "the person

8  for whose benefit the transfer was made." *See* RCW 19.40.081(b).  The absence of such

9  an instruction permitted Plaintiffs' attorneys to argue a broad definition of "benefit"

10  during closing argument.  Sportsman's attorney, however, was unable to refer the jury to

11  any other definition.  As such, the jury instructions did not "adequately cover the issues

12  presented." *Servs. Employees Int'l Union*, 718 F.3d at 1047.  Therefore, the court

13  conditionally grants Sportsman a new trial on the issue of liability for transfers between

14  Wholesale and other Defendants based on the omission of a jury instruction explaining

15  the phrase "the person for whose benefit the transfer was made." *See* Fed. R. Civ. P.

16  50(c); *Experience Hendrix L.L.C.*, 762 F.3d at 842.

17    **2.  Jury instructions**

18    Sportsman moves for a new trial on the basis that the jury instructions were

19  "incomplete." (Rule 59 Mot. at 13-14.)  Specifically, Sportsman objects that the court

20  did not instruct the jury, "A defendant cannot be liable for a transfer that occurred

21  between Wholesale and a different defendant." (Rule 59 Mot. at 13.)  Plaintiffs' contend

22  that Sportsman did not preserve this objection.  (Resp. to Rule 59 Mot. (Dkt. # 263) at 7.)

ORDER- 37

1   That contention is misguided.  During trial, Sportsman took specific exception to the

2   omission of that sentence from the jury instructions:

> For Sportsman's Warehouse, we take exception to Jury Instruction No. 41.
> The sentence that had been in there previously, "A defendant cannot be
> liable for a transfer that occurred between Wholesale and a different
> defendant" was removed.  We think that sentence should remain.  It's
> consistent with the definition of the transfer under 19.40.011(12).  It also
> makes clear that, you know, there are separate transfers at issue in this case.

6   (3/6/15 Tr. Trans. at 835:15-23.)  Sportsman's exception "stat[es] distinctly the matter

7   objected to and the grounds for the objection."  Fed. R. Civ. P. 51(c)(1).  As such, it

8   meets Rule 51's requirements.  *See Hunter*, 652 F.3d at 1230.

9       Turning to the merits of Sportsman's challenge, the court finds Sportsman is not

10  entitled to a new trial on the basis of the omitted sentence.  The court declined to include

11  the sentence in the jury instructions because it was, strictly speaking, an incorrect

12  statement of the law:  the plain language of the WUFTA provides that an entity can in

13  fact be liable for a transfer that occurred between the debtor and a third party.  *See* RCW

14  19.40.081(b).  Specifically, the WUFTA provides that, in the event of a fraudulent

15  transfer, "the creditor may recover judgment for the value of the asset transferred . . . or

16  the amount necessary to satisfy the creditor's claim, whichever is less."  *Id.*  "The

17  judgment may be entered against:  (1) The first transferee of the asset or the person for

18  whose benefit the transfer was made; or (2) Any subsequent transferee other than a good-

19  faith transferee or obligee who took for value or from any subsequent transferee or

20  obligee."  *Id.*  It was not error for the court to decline to include a jury instruction that

21  contradicted Washington state law.

22

ORDER- 38

1    Sportsman contends that the instruction was not incorrect when viewed in the

2    context of this specific case.  (Rule 59 Mot. at 13.)  Sportsman was free to argue to the

3    jury why, "in light of the evidence," Sportsman should not be held liable for transfers

4    Wholesale made to other defendants.  (*See id.*)  Sportsman did so.  (*See* 3/6/15 Tr. Trans.

5    at 1012:5-1024:22 (Sportsman's closing argument).)  The court was not required to

6    prejudge the evidence for the jury, which is what including Sportsman's requested

7    sentence would have amounted to.  Therefore, the court conditionally denies Sportsman's

8    motion for a new trial based on the fact that the jury instructions did not include a

9    sentence instructing the jury that Sportsman could not be held liable for transfers that

10   Wholesale made to other defendants.  *See* Fed. R. Civ. P. 50(c); *Freund*, 347 F.3d at 764.

11   Alternatively, as discussed in the preceding section, *see* § III.E.1, the court conditionally

12   grants Sportsman a new trial on the issue of liability for transfers between Wholesale and

13   other defendants based on the omission of a jury instruction explaining the phrase "the

14   person for whose benefit the transfer was made."  *See* Fed. R. Civ. P. 50(c); *Experience*

15   *Hendrix L.L.C.*, 762 F.3d at 842.

16       **3.  Verdict form**

17       Sportsman moves for a new trial on the basis that the special verdict form was

18   "confusing."  (Rule 59 Mot. at 14.)  Specifically, Sportsman renews its objection that the

19   verdict form did not "break out each alleged fraudulent transfer separately."  (*Id.*; *see also*

20   3/6/15 Tr. Trans. at 836:5-10 ("[W]ithout that wording in Instruction No. 41, I think we

21   take exception to the Special Verdict Form in not breaking out each transfer under the

22

1  UFTA section.").) The court finds that Sportsman is not entitled to a new trial on that

2  basis.

3      The special verdict form included a separate interrogatory for each Plaintiff's

4  fraudulent transfer claim against each Defendant.  (*See* Verdict.)  For example, with

5  respect to UFA, the verdict form read:

6      **Question No. 6:**  Do you find that Lacey has proved its fraudulent transfer
       claim against UFA?

7

8          Yes:  _____
           No:   _____

9      *If you answered "yes" to Question No. 6, proceed to Question No. 7.  If you*
       *answered "no" to Question No. 6, skip Question No. 7 and proceed to*

10     *Question No. 8.*

11     **Question No. 7:**  What do you find is the amount to which Lacey is entitled
       as a result of its fraudulent transfer claim against UFA?

12         _____

13  (*See id.*)

14      With respect to Sportsman, the verdict form continued:

15     **Question No. 8:**  Do you find that Lacey has proved its fraudulent transfer
       claim against Sportsman?

16

17         Yes:  _____
           No:   _____

18     *If you answered "yes" to Question No. 8, proceed to Question No. 9.  If you*
       *answered "no" to Question No. 8, skip Question No. 9 and proceed to*

19     *Question No. 10.*

20     **Question No. 9:**  What do you find is the amount to which Lacey is entitled
       as a result of its fraudulent transfer claim against Sportsman?

21         _____

22  (*Id.*)  And so on for the other Defendants and other Plaintiff.  (*Id.*)

1    It was unnecessary and inadvisable to require the jury to answer a separate

2  interrogatory for each alleged fraudulent transfer for the following reasons.  First,

3  separate interrogatories concerning each Defendant's liability for each transfer would

4  have been superfluous:  the jury instructions specifically admonished the jury to evaluate

5  each transfer separately.  Specifically, Jury Instruction Number 29 instructed the jury,

6  "There are four circumstances in which a transfer is fraudulent.  *You must consider each*

7  *transfer separately to determine if it meets one of the four circumstances*."  (Jury Instr.

8  No. 29 (emphasis added).)

9    Second, the case concerned five Defendants and numerous allegedly fraudulent

10 transfers by Wholesale.  Requiring the jury to answer separate interrogatories concerning

11 each Defendant's liability for each transfer would have resulted in an unwieldy and

12 confusing verdict form.

13   Third, Sportsman itself did not propose a verdict form that "[broke] out each

14 alleged fraudulent transfer separately."  (Rule 59 Mot. at 14.)  Sportsman's proposed

15 verdict form included three separate interrogatories for each defendant—one for each

16 type of fraudulent transfer claim.  (*See* Disp. Prop. Jury. Instr. (Dkt. # 160) at 77-78.)[19]

17   Fourth, Sportsman cannot show that failing to provide separate interrogatories

18 concerning each Defendant's liability for each transfer is legal error.  Sportsman

19

20 [19] (*See, e.g.*, Disp. Prop. Jury. Instr. at 77 ("3. Did Wholesale Sports transfer assets to
Sportsman's Warehouse (a) without receiving reasonably equivalent value in exchange and (b) at the time
the transfers were made, did Wholesale Sports intend to incur or reasonably believe that it would incur

21 debts beyond its ability to pay as they became due? . . . 4. Did Wholesale Sports transfer assets to
Sportsman's Warehouse (a) without receiving reasonably equivalent value in exchange and (b) Wholesale
Sports was insolvent at that time or became insolvent as a result of the transfer?").)

22

ORDER- 41

1    contends: "[A] key issue in the case was the separateness of the Sportsman's/Wholesale

2    transfer from the Wholesale/UFA transfer.  The special verdict form, however, took that

3    issue away from the jury by treating all transfers as one."  (Rule 59 Mot. at 14.)  That

4    contention is flawed.  Once again, Sportsman assumes a factual state that did not exist:

5    before trial, the court specifically held that there was a question of fact as to whether

6    Sportsman transferred the purchase price to Wholesale or UFA.  (1/28/15 Order (Dkt.

7    # 149) at 13-14 (order on motions for summary judgment).)[20]  The jury was therefore free

8    to assess the "separateness of the Sportsman's/Wholesale transfer from the

9    Wholesale/UFA transfer," if any.  (*See* Rule 50 Mot. at 14.)  That very question of fact,

10   however, precluded the court from making separate interrogatories for the

11   "Sportsman's/Wholesale transfer" and the "Wholesale/UFA transfer."  After all, if the

12   jury found that Sportsman had transferred the money directly to UFA, there could be no

13   transfer from Wholesale to UFA, in other words, no "Wholesale/UFA transfer."  The

14   court could not give Sportsman's preferred version of the verdict form without

15   prejudging the conflicting evidence for the jury.  Therefore, the court did not err in

16   declining to give separate interrogatories for each alleged fraudulent transfer.

17        Finally, the jury verdict against Defendants Alamo and Mr. Gaube on the

18   fraudulent transfer claims does not demonstrate error in the verdict form.  Sportsman

19   contends that the jury improperly awarded Plaintiffs' full measure of damages against

20   _____

21        [20] The court's ruling on the issue as raised in Sportsman's renewed motion for judgment as a
     matter of law is different from its ruling on the issue as raised Sportsman's motion for summary judgment
     because at trial, Sportsman presented additional, compelling evidence in its favor, namely, the testimony

22   of Mr. Vuch.  (*See* 1/28/15 Order at 12-14 (summarizing the evidence in each party's favor).)

ORDER- 42

1    Alamo and Mr. Gaube, despite the fact that the evidence showed they either did not

2    receive a transfer from Wholesale or received a transfer worth substantially less than the

3    awarded damages.  (*See* Rule 59 Mot. at 14; Jury Instr. No. 41.)  At closing argument,

4    however, Plaintiffs' counsel explicitly directed the jury to enter the full amount of

5    damages against Alamo and Mr. Gaube on the fraudulent transfer claims.  (3/6/15 Tr.

6    Trans. at 983:16-25.)[21]  Plaintiffs' counsel made that direction on the premise, as

7    discussed in Section III.E. *supra*, that Alamo and Mr. Gaube could be liable as entities

8    that "benefitted" from the MTA.  Sportsman fails to explain how the verdict form, rather

9    than Plaintiffs' counsel's argument, can be faulted for the jury's allegedly incorrect

10   damages award.[22]  For all of these reasons, the court conditionally denies Sportsman's

11   motion for a new trial on the basis of the "confusing" verdict form.  *See* Fed. R. Civ. P.

12   50(c); *Freund*, 347 F.3d at 764.

13   //

14   //

15   //

16   

17   [21] Specifically, Lacey's counsel argued:

18   The judge has given you a special verdict form.  And this is what it looks like.  Yours is
     the same. Here's how we believe you should fill it out: . . . Do you find that Lacey has
     proved its fraudulent transfer claim against Sportsman's?  Yes.  What do you find is the
     amount to which Lacey is entitled?  $5,202,671.  Do you find that Lacey has proved its

19   fraudulent transfer claim against Alamo?  Yes.  The amount?  $5,202,671.  Fraudulent
     transfer claim against Mr. Gaube?  Yes.  The amount is the same.

20   (3/6/15 Tr. Trans. at 982:20-983:25.)

21   [22] Becase Alamo and Mr. Gaube have not moved for judgment as a matter of law, the court

22   makes no determination as to the correctness or incorrectness of the jury's verdict or damages award
     against Alamo and Mr. Gaube on the fraudulent transfer claims.

ORDER- 43

1

## IV.   CONCLUSION

2        For the foregoing reasons, the court GRANTS in part and DENIES in part

3 Sportsman's renewed motion for judgment as a matter of law (Dkt. # 253) and GRANTS

4 in part and DENIES in part Sportsman's motion for a new trial (Dkt. # 255).

5        Specifically, the court GRANTS judgment as a matter of law in Sportsman's favor

6 on the constructive fraudulent transfer claims, the actual fraudulent transfer claim, and

7 the question of Sportsman's liability for Wholesale's transfers to other Defendants as "a

8 person for whose benefit the transfers were made."

9        Alternatively, the court CONDITIONALLY GRANTS a new trial on the

10 constructive fraudulent transfer claims, the actual fraudulent transfer claim, and the

11 question of Sportsman's liability for Wholesale's transfers to other Defendants as "a

12 person for whose benefit the transfers were made."

13        The court DENIES Sportsman's motion for judgment as a matter of law on the

14 good faith purchaser defense and the applicability of Washington's Uniform Trade

15 Secrets Act.

16 //

17 //

18 //

19 //

20 //

21 //

22 //

ORDER- 44

1    The court DENIES Sportsman's motion for a new trial based on Plaintiffs'

2  counsel's closing argument, the allegedly "incomplete" jury instructions, and the

3  allegedly "confusing" verdict form.

4    Dated this 29th day of July, 2015.

5

6

7  _____

8  JAMES L. ROBART
   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 45